# EXHIBIT A

## Allegheny County Department Of Court Records

### Civil/Family Division Docket Report

**Run Date and Time: 4/7/2021 - 10:2:29**

---

GD-21-003192

Bailey vs Ulta Salon Cosmetics & Fragrance Inc.

**Filing Date:**
4/1/2021

**Related Cases:**

**Consolidated Cases:**

**Judge:**
No Judge

**Amount In Dispute:**
$ 0

**Case Type:**
Other Tort

**Court Type:**
General Docket

**Current Status:**
Acceptance of Service

**Jury Requested:**
Y

---

### --Parties--

| LName | FName | MI | Type | Address | Initial Service Completion | Attorney |
|---|---|---|---|---|---|---|
| Bailey | Martha | | Plaintiff | | -- | Kevin W. Tucker |
| Ulta Salon Cosmetics & Fragrance Inc. | | | Defendant | | -- | -- |

### --Attorney--

| LName | FName | MI | Type | Address | Phone |
|---|---|---|---|---|---|
| Tucker | Kevin | W. | Plaintiff's Attorney | 6901 Lynn Way Suite 215 Pittsburgh PA 15208 | 4128775220 |

### --Non Litigants--

| LName | FName | MI | Type | Address | Phone |
|---|---|---|---|---|---|
| | | No Litigants Found | | | |

### --Docket Entries--

| Filing Date | Docket Type | Docket Text | Filing Party |
|---|---|---|---|
| 4/6/2021 | Acceptance of Service | Of (Complaint) by (Atty for Defendant) on 04/05/21. | Martha Bailey |

| Filing Date | Docket Type | Docket Text | Filing Party |
|---|---|---|---|
| 4/1/2021 | Complaint | | Martha Bailey |

| --Judgments Against-- | | |
|---|---|---|
| Name | Amount | Satisfied(Y,N) |
| No Judgments Found | | |

| --Events Schedule-- | | | |
|---|---|---|---|
| Event Scheduled | Event Date & Time | Room Number | Judge/Hearing Officer |
| No Information Found | | | |

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

_____ County

| For Prothonotary Use Only: | TIME STAMP |
|---|---|
| Docket No: | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☐ Complaint
- ☐ Writ of Summons
- ☐ Transfer from Another Jurisdiction
- ☐ Petition
- ☐ Declaration of Taking

Lead Plaintiff's Name:

Lead Defendant's Name:

**Are money damages requested?  ☐ Yes    ☐ No**

Dollar Amount Requested:  ☐ within arbitration limits
(check one)  ☐ outside arbitration limits

**Is this a *Class Action Suit*?    ☐ Yes    ☐ No**

**Is this an *MDJ Appeal*?    ☐ Yes    ☐ No**

Name of Plaintiff/Appellant's Attorney: _____

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**SECTION B**

**Nature of the Case**: Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** (*do not include Mass Tort*)
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability (*does not include mass tort*)
- ☐ Slander/Libel/ Defamation
- ☐ Other:
  _____
  _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:
  _____
  _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:
  _____
  _____

**CONTRACT** (*do not include Judgments*)
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
  _____
  _____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
  _____
  _____
- ☐ Other:
  _____
  _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:
  _____
  _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
  _____
  _____
- ☐ Zoning Board
- ☐ Other:
  _____
  _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:
  _____
  _____

*Updated 1/1/2011*

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| MARTHA BAILEY, individually and on behalf of all others similarly situated, | CIVIL DIVISION |
| Plaintiff, | No. |
| | CLASS ACTION |
| v. | **CLASS ACTION COMPLAINT** |
| ULTA SALON, COSMETICS & FRAGRANCE, INC., | |
| Defendant. | |

Filed on behalf of Plaintiff:
Martha Bailey

Counsel of record for Plaintiff:

Kevin W. Tucker (He/Him/His)
Pa. No. 312144
EAST END TRIAL GROUP LLC
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
Tel. (412) 877-5220
ktucker@eastendtrialgroup.com

*Other Attorneys On Signature*

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| MARTHA BAILEY, individually and on behalf of all others similarly situated, | CIVIL DIVISION |
| Plaintiff, | No. |
| | CLASS ACTION |
| v. | |
| ULTA SALON, COSMETICS & FRAGRANCE, INC., | |
| Defendant. | |

### NOTICE TO DEFEND

**YOU HAVE BEEN SUED IN COURT.** If you wish to defend against the claims set forth in the following pages, you must take action within **TWENTY (20)** days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the Complaint or for any claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

**IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

LAWYER REFERRAL SERVICE
Allegheny County Bar Association
11th Floor Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 261-5555

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| MARTHA BAILEY, individually and on behalf of all others similarly situated, | CIVIL DIVISION |
| | No. |
| Plaintiff, | CLASS ACTION |
| v. | |
| ULTA SALON, COSMETICS & FRAGRANCE, INC., | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiff Martha Bailey ("Plaintiff" or "Bailey"), individually and on behalf of all others similarly situated, brings this action against Defendant Ulta Salon, Cosmetics & Fragrance, Inc. ("Defendant" or "Ulta"), and alleges as follows:

**NATURE AND SUMMARY OF THE ACTION**

1.      In this putative class action, Plaintiff alleges that Defendant knowingly, negligently, or deceptively falsely advertised the price of protective face masks, represented that protective face masks were subject to Pennsylvania sales tax, and overcharged Plaintiff in an amount equal to and purporting to be Pennsylvania sales tax, when they were not subject to Pennsylvania sales tax, in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 *et seq.*

2.      The facts alleged in this matter are simple and straightforward.

3.      In 2020, as the ongoing coronavirus pandemic raged toward its peak, Plaintiff purchased protective face masks from Defendant, who owns, operates, or otherwise controls retail sales of consumer goods, including protective face masks, in Pennsylvania.

1

4.     Regarding each transaction, Defendant knowingly, negligently, or deceptively advertised one price, but, implicitly representing that the masks were subject to Pennsylvania sales tax, charged Plaintiff an amount equal to what would have been, and which Defendant purported via notation on the sales receipt to be, Pennsylvania sales tax, which Plaintiff discovered later after reviewing her receipt.

5.     Defendant should not have required payment of or charged sales tax on protective face masks because the only reason for buying protective face masks during the pandemic was for a medical purpose and for use as everyday wear, and it is alleged, on information and belief, that Defendant only manufactured and sold such masks for a medical purpose and for use as everyday wear.

6.     Defendant also should not have required payment of or charged sales tax on protective face masks because following the pandemic and various government issued orders requiring consumers to wear protective face masks, such masks have become everyday wear and medical supplies, to the extent they were not designed or intended for such purposes.

7.     In each transaction, Defendant's conduct in advertising one price but charging another, misrepresenting that protective face masks were subject to Pennsylvania sales tax, and/or overcharging Plaintiff in an amount equal to and purporting to be Pennsylvania sales tax caused Plaintiff to lose this amount of money, and the retention and use of that money, which she otherwise would have had.

8.     Accordingly, Plaintiff alleges that she purchased the protective face masks primarily "for personal, family, and/or household use," that Defendant acted "in the conduct of trade or commerce," that Defendant's conduct constituted false advertising, misrepresentation, and deceptive conduct amounting to violations of subsections of the UTPCPL prohibiting

2

retailers from, among other things: (1) "Representing that goods or services have . . .
characteristics . . . that they do not have"; (2) "Advertising goods with intent not to sell them as
advertised"; and/or (3) "Engaging in any other fraudulent or deceptive conduct which creates a
likelihood of confusion or misunderstanding," and that Defendant caused Plaintiff to lose this
amount of money, and the retention and use of this amount of money, which she otherwise
would have had.

9.     Plaintiff requests relief in the form of statutory damages for each transaction, plus
statutorily available costs and attorney's fees.

## JURISDICTION AND VENUE

10.    The Court has subject matter jurisdiction under 42 Pa. C.S. § 931.

11.    The Court has personal jurisdiction over Defendant under 42 Pa. C.S. § 5301.

12.    Venue is proper under Pa. R. Civ. P. 2179 because Defendant regularly conducts
business in this County, this is the County where the cause of action arose, and/or this is the
County where the transactions or occurrences took place out of which the cause of action arose.

## PARTIES

13.    Bailey is a natural person over the age of eighteen.

14.    Bailey resides in Pennsylvania.

15.    Ulta is a Delaware corporation headquartered in Bolingbrook, Illinois.

16.    Ulta operates brick-and-mortar and online retail stores under the Ulta brand name.

17.    Ulta owns, operates, or manages at least 45 brick-and-mortar retail locations in
Pennsylvania.

3

## FACTUAL ALLEGATIONS

18.    While sales of goods in Pennsylvania generally are subject to Pennsylvania sales tax, there are many statutory exemptions. 72 P.S. §§ 7202, 7204.

19.    The two exemptions relevant here include "medical supplies" and "clothing." 72 P.S. § 7204(17), (26).

20.    "Medical supplies" include "tangible personal property for use in alleviation or treatment of injury, illness, disease or incapacity." 61 Pa. Code. § 52.1(b)(2).

21.    "The determination that purchases qualify for exemption as … medical supplies … is based essentially upon the use for which the purchases are intended." 61 Pa. Code § 52.1(a).

22.    "Clothing" includes "[a]rticles, including vesture, wearing apparel, raiments, garments or shoes, which are designed to cover the human body as ordinary or everyday wear," but excludes "accessories" and "ornamental wear," which are "[a]rticles, other than clothing" "designed to be worn on or about the human body" and "designed and normally worn for decorative purposes," respectively.  61 Pa. Code. § 53.1.

23.    Prior to the ongoing coronavirus pandemic, non-surgical masks were designed or normally worn as accessories or ornamental wear, *i.e.*, as part of a costume.

24.    Those face masks were taxable because they were not designed or intended for medical purposes or for use as everyday wear.

25.    On and after the ongoing coronavirus pandemic, protective face masks, like the masks purchased by Plaintiff and the members of the class, were designed and intended to serve only medical purposes and to be used as everyday wear.

26.    These face masks were non-taxable because they were designed or intended for medical purposes or for use as everyday wear.

27.    The retailers that sold such masks, including Defendant, knew or should have known the masks were to be used only for medical purposes and as everyday wear, as there was no other use for the masks at issue, and such masks were designed and intended to serve only medical purposes (to combat the physical spread of COVID-19) and to be used as everyday wear (to comply with government guidance and orders).

28.    To the extent such protective face masks were not specifically designed or intended for medical use or for use as everyday wear, Defendant knew or should have known such face masks fell within one or both of these non-taxable categories at and after the onset of the coronavirus pandemic.

29.    First, at and after the onset of the coronavirus pandemic, Pennsylvania residents were strongly encouraged and then ordered to wear masks to help beat back the national health crisis any time they left their homes.[1]

---

[1] *See*, *e.g.*, Claire Hansen, U.S. News, *CDC Advises All Americans to Wear Cloth Masks in Public* (Apr. 3, 2020), available at https://www.usnews.com/news/national-news/articles/2020-04-03/cdc-advises-all-americans-to-wear-cloth-masks-in-public (last accessed Mar. 30, 2021); Fifth Judicial District of Pennsylvania, *Policy for entering Court Facilities During the Coronavirus Pandemic* (Rev. 6/18/20), available at https://www.alleghenycourts.us/downloads/Administration/EntryandMaskpolicy.pdf (last accessed Apr. 1, 2021) ("Persons entering Court facilities or offices must wear a protective mask or cloth face covering at all times, consistent with CDC guidance."); Ex. 1, Pennsylvania Dept. of Health, *Order of the Secretary of the Pennsylvania Dept. of Health Directing Public Health Safety Measures for Businesses Permitted to Maintain In-person Operations*, p. 5 (April 15, 2020); Ex. 2, Pennsylvania Dept. of Health, *Order of the Secretary of the Pennsylvania Department of Health Requiring Universal Face Coverings* (Jul. 1, 2020); Ex. 3, Office of the Governor, Press Release, *Gov. Wolf Reminds Pennsylvanians: 'Masks are Mandatory'* (Jul. 3, 2020) ("Masks are mandatory when leaving the home[.]"); Ex. 4, Pennsylvania Dept. of Health, *Updated Order of the Secretary of the Pennsylvania Department of Health Requiring Universal Face Coverings: Frequently Asked Questions* (Nov. 17, 2020); Ex. 5, Centers for Disease

30.    These orders and recommendations remain in place.[2]

31.    Second, and regardless of any guidance or orders, at and after the onset of the coronavirus pandemic, wearing protective face masks has become routine[3] and is done only for medical purposes.

32.    For these reasons, Defendant knew or should have known that the sale of protective face masks was not subject to sales tax because such masks became and now are properly characterized as everyday wear and medical supplies.

33.    Guidance from the Department of Revenue bears this out.

34.    On April 23, 2020, after the Governor's March 6, 2020 declaration[4] that the pandemic constituted a natural disaster, the Department indicated on its website that "protective face masks" would be "exempt from Pennsylvania sales tax."[5]

35.    Then, on January 20, 2021, the Department issued a Bulletin first explaining that, pre-pandemic, face masks were taxable:

> Medical supplies, including medical and disposable surgical masks, are exempt from Pennsylvania sales tax. 72 P.S. § 7204(17); Retailer's Information Guide (REV-717). Prior to COVID-19, non-

---

Control and Prevention, *Requirement for Persons to Wear Masks While On Conveyances and Transportation Hubs* (Jan. 29, 2021).

[2] *See, e.g.*, Ex. 6, Centers for Disease Control and Prevention, *Your Guide to Masks* (updated Feb. 22, 2021), also available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html (last accessed Mar. 30, 2021) ("CDC recommends that people wear masks in public settings, at events and gatherings, and anywhere they will be around other people.").

[3] The Centers for Disease Control and Prevention provides instructions on how to wash reusable face masks, like some Plaintiffs bought, instructing individuals to "[i]nclude your mask with your regular laundry." Ex. 7, Centers for Disease Control and Prevention, *How to Store and Wash Masks* (updated Oct. 28, 2020).

[4] Ex. 8, Governor Tom Wolf, *Proclamation of Disaster Emergency* (Mar. 6, 2020 and extended on June 3, 2020, Aug. 31, 2020, Nov. 24, 2020, and Feb. 19, 2021).

[5] Ex. 9, Pennsylvania Dept. of Revenue, *Masks and Ventilators* (Apr. 23, 2020).

medical masks and face coverings were subject to sales tax because non-medical masks and face coverings were generally classified as ornamental wear or clothing accessories and the use for which consumers purchased non-medical masks and face coverings was not for an exempt purpose. 72 P.S. § 7204(26); Retailer's Information Guide (REV-717). Retailers were not obligated to determine whether a non-medical mask or face covering would be used for medical purposes because "[t]he determination that purchases qualify for exemptions as . . . medical supplies and the like, is based essentially upon the use for which the purchase[s] are intended." 61 Pa. Code § 52.1(a).[6]

36.    The Department went on to explain that, post-pandemic, face masks were non-taxable:

On March 6, 2020, pursuant to the provisions of Subsection 7301(c) of the Emergency Management Code, 35 Pa.C.S. § 7101, *et seq.*, Governor Tom Wolf issued a Proclamation of Disaster Emergency in response to the COVID-19 pandemic, authorizing "all Commonwealth departments and agencies [to] utilize all available resources . . . as deemed necessary to cope with this emergency situation." In response to consumer demand for medical masks outpacing supply and leading customers to use non-medical masks and face coverings for medical purposes, namely to prevent and control the spread of COVID-19, the department responded with a statement that any non-medical cloth or disposable mask purchased for use as a means of protection against the virus was not subject to sales or use tax.

*Id.*

37.    The Department then indicated that customers could obtain refunds for, and businesses would not be required to remit, sales tax on protective face masks:

Accordingly, the department will not assess retailers for failing to collect sales tax on purchases of non-medical masks and face coverings. Additionally, consumers who can certify to the department that a cloth or disposable non-medical mask or face covering was purchased and used as a means of protection against the virus can petition the department for a refund of any sales tax paid.

---

[6] Ex. 10, Pennsylvania Dept. of Revenue, *Sales and Tax Bulletin 2021-01* (Jan. 20, 2021).

*Id.*

38.    The Department also indicated it had recently recognized protective face masks were exempt from Pennsylvania sales tax as everyday clothing as well:

> As of October 30, 2020, in response to the ubiquitous use of non-medical masks and face coverings, the department recognizes that both cloth and disposable non-medical masks and face coverings are exempt from sales and use tax as everyday wear or clothing.

*Id.*

39.    In short, the face masks at issue were designed and intended for medical purposes and for use as everyday wear, meaning Defendant knew or should have known the masks were non-taxable.

40.    But even if the face masks at issue were not so designed, Defendant knew or should have known the masks were non-taxable at and after the onset of the coronavirus pandemic because such masks became medical supplies and everyday wear following the pandemic.

41.    Yet Defendant charged sales tax on non-taxable face masks and required payment of sales tax to obtain non-taxable face masks.

42.    Plaintiff paid such sales tax in response to and as a result of Defendant's conduct.

43.    Had Defendant not charged sales tax on the face masks Plaintiff purchased, Plaintiff would not have paid such tax.

44.    And had Defendant not required payment of sales tax on the face masks Plaintiff purchased, Plaintiff could have bought the face masks without paying the sales tax Defendant required Plaintiff to pay.

45.     By charging sales tax on non-taxable face masks, and by requiring payment of such tax to obtain non-taxable face masks, Plaintiff lost money and the retention and use of her money as a result of Defendant's wrongful conduct.

46.     Ulta sells protective face masks.

47.     Bailey bought two protective face masks from Ulta at a retail store located at 20111 Route 19, Suite 110, Cranberry Township, PA 16066, on October 17, 2020.

48.     Ulta advertised the masks Bailey purchased as costing $2.50 each, or a total of $5.00.

49.     Yet Ulta charged, and Bailey paid, $5.30 for the masks.

50.     The extra $0.30 equals 6% of the masks' advertised price.

51.     Bailey did not discover the extra $0.30 charge until reviewing her receipt after her purchase.[7]

52.     The receipt identified the extra $0.30 charge as sales tax.

53.     Ulta operates, controls, maintains, and is otherwise responsible for the POS systems in its brick-and-mortar locations and online stores.

54.     Ulta's POS systems regularly charge and collect sales tax on protective face masks sold at Ulta's brick-and-mortar locations in Pennsylvania and online to persons in Pennsylvania.

55.     By charging and collecting sales tax on protective face masks, Ulta denied Bailey and the Class the money and the benefit of the use and retention of money they otherwise would have had, benefited from, or held.

56.     Bailey and the Class suffered harm as a result of Ulta's conduct.

---

[7] Ex. 11, Ulta Receipt.

9

## CLASS ACTION ALLEGATIONS

57.     Bailey brings this action individually and on behalf of all others similarly situated under Rules 1702, 1708, and 1709 of the Pennsylvania Rules of Civil Procedure.

58.     Bailey seeks to certify the following Class: "All Pennsylvania citizens who are domiciled in Pennsylvania and who purchased a protective face mask or face covering from Defendant at a retail store in Pennsylvania, or from Defendant over the internet and arranged for delivery of the protective face mask into Pennsylvania, and who were charged an amount purporting to represent sales tax on that purchase since March 6, 2020."

59.     Bailey reserves the right to expand, narrow, or otherwise modify the Class as the litigation continues and discovery proceeds.

60.     Pa. R. Civ. P. 1702(1), 1708(a)(2): The Class is so numerous that joinder of its Class Members is impracticable. Defendant charged sales tax on approximately 25,000 transactions of face masks in Pennsylvania during the relevant time. Since each of the claims of the Class Members is substantially identical, and the Class Members request substantially similar relief, centralizing the Class Members' claims in a single proceeding likely is the most manageable litigation method available.

61.     Pa. R. Civ. P. 1702(2), 1708(a)(1): Bailey and each Member of the Class share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over any individual issues. For example, there is a single common answer to the question of whether Defendant violated the UTPCPL by charging Class Members 6% or more than the advertised price for protective face masks. The answer to this question is the same for Bailey and each Member of the Class, and Bailey and each Member of the Class require the

10

same proof to answer this question. This question, and other common questions of law and fact, predominate over any individual issues.

62.    <u>Pa. R. Civ. P. 1702(3):</u> Bailey's claims are typical of the claims of each Member of the Class because the claims are based on the same legal theories and arise from the same conduct.

63.    <u>Pa. R. Civ. P. 1702(4), 1709:</u> Bailey is an adequate representative of each Member of the Class because the interests of Bailey and each Member of the Class align. Bailey will fairly, adequately, and vigorously represent and protect the interests of each Member of the Class and has no interest antagonistic to any Member of the Class. Bailey retained counsel who are competent and experienced in the prosecution of class action litigation generally and UTPCPL litigation specifically. Bailey has or can acquire adequate financial resources to assure that the interests of each Member of the Class will not be harmed.

64.    <u>Pa. R. Civ. P. 1708(a)(3), (6), (7):</u> Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief that Bailey and each Member of the Class may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Bailey and each Member of the Class. Additionally, requiring Bailey and each Member of the Class to file individual actions would impose a crushing burden on the court system. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

65.    <u>Pa. R. Civ. P. 1708(a)(4):</u> Based on the knowledge of Bailey and undersigned counsel, there are no similar cases currently pending against Defendant. However, there are similar actions pending in this court against other parties. *See Garcia v. American Eagle*

*Outfitters, Inc., et al.,* GD-20-11057; *Garcia v. Foot Locker Retail, Inc., et al.*, GD-21-2107;

*Garcia v. Walgreen Co., et al.*, GD-21-2250.

66.   <u>Pa. R. Civ. P. 1708(a)(5):</u> This forum is appropriate for this litigation, as

Defendant regularly conducts business in this County and all or part of the claims arose in this

County.

<div align="center">

**<u>COUNT I</u>**
**Violation of the Unfair Trade Practices and Consumer Protection Law**
**73 Pa. Stat. § 201-1,** *et seq.*

</div>

67.   This claim is brought individually and on behalf of the Class.

68.   Plaintiff and Defendant are persons, the protective face masks are goods

purchased for personal, family, and/or household use, and Defendant's conduct described herein

is trade or commerce under the UTPCPL. 73 Pa. Stat. § 201-2(2)-(3), 201-9.2.

69.   Defendant's conduct described herein constitutes unfair methods of competition

and unfair or deceptive acts or practices under the UTPCPL because: i) Defendant represented

that goods have characteristics they do not have; ii) Defendant advertised goods with intent not

to sell them as advertised; and iii) Defendant engaged in fraudulent or deceptive conduct which

created a likelihood of confusion or misunderstanding. 73 P.S. § 201-2(4)(v), (ix), (xxi).

70.   Defendant's use of unfair methods of competition and unfair or deceptive acts or

practices in the conduct of trade or commerce violates 73 P.S. § 201-3.

71.   Plaintiff and the Class Members lost money or property as a result of Defendant's

violations and therefore are entitled to one hundred dollars ($100) per violation under 73 P.S.

201-9.2, as well as reasonable costs and attorneys' fees and such additional relief the Court

deems necessary and proper.

<div align="center">12</div>

## JURY TRIAL DEMANDED

Bailey requests a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Bailey prays for the following relief:

a.    An order certifying the proposed Class, appointing Bailey as representative of the proposed Class, and appointing undersigned counsel as counsel for the proposed Class;

b.    An order awarding one hundred dollars ($100.00) per violation of the UTPCPL, and not a refund of the overcharges that Defendant misrepresented as sales tax;

c.    An order awarding attorneys' fees and costs; and

d.    An order awarding all other relief that is just, equitable and appropriate.

Respectfully Submitted,

Dated: April 1, 2021

/s/ Kevin W. Tucker

Kevin W. Tucker (He/Him/His)
Pa. No. 312144
Kevin J. Abramowicz
Pa. No. 320659
**EAST END TRIAL GROUP LLC**
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
Tel. (412) 877-5220
Fax. (412) 626-7101
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com

Jason M. Leviton (*pro hac* forthcoming)
Lauren Godless (*pro hac* forthcoming)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
Tel. (617) 398-5600
jason@blockleviton.com

13

lauren@blockleviton.com
*Counsel for Plaintiff*

## **<u>VERIFICATION</u>**

I, Martha Bailey, am fully familiar with the facts set forth in this Complaint and believe them to be true and correct to the best of my knowledge, information, and belief. I understand any false statements herein are made subject to the penalties of 18 Pa. C.S § 4904, relating to unsworn falsification to authorities.

Respectfully Submitted,

Dated: April 1, 2021                    */s/ Martha Bailey*
                                        Martha Bailey
                                        E-Signed with Permission

Exhibit 1

Pennsylvania Dept. of Health, *Order of the Secretary of the Pennsylvania Department of Health Directing Public Health Safety Measures for Businesses Permitted to Maintain In-person Operations* (April 15, 2020)

**Pennsylvania**
DEPARTMENT OF HEALTH

# Order of the Secretary of the Pennsylvania Department of Health Directing Public Health Safety Measures for Businesses Permitted to Maintain In-person Operations

The 2019 novel coronavirus (COVID-19) is a contagious disease that is rapidly spreading from person to person in the Commonwealth of Pennsylvania. COVID-19 can be transmitted from people who are infected with the virus even if they are asymptomatic or their symptoms are mild, such as a cough. Additionally, exposure is possible by touching a surface or object that has the virus on it and then touching one's mouth, nose, or eyes.

COVID-19 is a threat to the public's health, for which the Secretary of Health may order general control measures, including, but not limited to, closure, isolation, and quarantine. This authority is granted to the Secretary of Health pursuant to Pennsylvania law. *See* Section 5 of the Disease Prevention and Control Law, 35 P.S. §§ 521.1, 521.5; sections 2102 and 2106 of the Administrative Code of 1929, 71 P.S. §§ 532, 536; and the Department of Health's (Department's) regulations at 28 Pa. Code §§ 27.60-27.68 (relating to disease control measures; isolation; quarantine; movement of persons subject to isolation or quarantine; and release from isolation and quarantine). Particularly, the Secretary has the authority to take any disease control measure appropriate to protect the public from the spread of infectious disease. *See* 35 P.S. § 521.5; 71 P.S. §§ 532(a), 1402(a); 28 Pa. Code § 28.60.

Recognizing that certain life-sustaining businesses in the Commonwealth must remain open despite the need for strong mitigation to slow the spread of the virus, I am ordering certain actions to be taken by employers and their employees to protect their health and lives, the health and lives of their families, and the health and lives of the residents of the Commonwealth who depend upon their services. Special consideration is required to protect not only customers, but the workers needed to run and operate these establishments.

As cleaning, disinfecting, and other maintenance and security services performed by building service employees are critical to protecting the public health by reducing COVID-19 infection in the Commonwealth, I previously directed building safety measures in an Order that went into effect at 12:01 a.m. on April 6, 2020. Similarly, based upon the manner of COVID-19's continued and extensive spread in the Commonwealth and in the world, and its danger to Pennsylvanians, I have determined that an additional appropriate disease control measure is the further direction of safety measures for all employees and visitors at life-sustaining businesses that have remained open during the COVID-19 disaster emergency.

Accordingly, on this date, April 15, 2020, to protect the public from the spread of COVID-19, I hereby order:

A. A business that is authorized to maintain in-person operations, other than health care providers, pursuant to the Orders that the Governor and I issued on March 19, 2020, as subsequently amended, shall implement, as applicable, the following social distancing, mitigation, and cleaning protocols:

(1) in addition to maintaining pre-existing cleaning protocols established in the business, as specified in paragraph (2) below, clean and disinfect high-touch areas routinely in accordance with guidelines issued by the Centers for Disease Control and Prevention (CDC), in spaces that are accessible to customers, tenants, or other individuals;

(2) maintain pre-existing cleaning protocols established by the business for all other areas of the building;

(3) establish protocols for execution upon discovery that the business has been exposed to a person who is a probable or confirmed case of COVID-19, including:

a. close off areas visited by the person who is a probable or confirmed case of COVID-19. Open outside doors and windows and use ventilation fans to increase air circulation in the area. Wait a minimum of 24 hours, or as long as practical, before beginning cleaning and disinfection. Cleaning staff should clean and disinfect all areas such as offices, bathrooms, common areas including but not limited to employee break rooms, conference or training rooms and dining facilities, shared electronic equipment like tablets, touch screens, keyboards, remote controls, and ATM machines used by the ill person, focusing especially on frequently touched areas;

b. identify employees that were in close contact (within about 6 feet for about 10 minutes) with a person with a probable or confirmed case of COVID-19 from the period 48 hours before symptom onset to the time at which the patient isolated;

i. If the employee remains asymptomatic, the person should adhere to the practices set out by the CDC in its April 8, 2020 Interim Guidance for Implementing Safety Practice for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19;

ii. If the employee becomes sick during the work day, the person should be sent home immediately. Surfaces in the employee's workspace should be cleaned and disinfected. Information on other employees who had contact with the ill employee during the time the employee had symptoms

2

and 48 hours prior to symptoms should be compiled. Others at the workplace with close contact within 6 feet of the employee during this time would be considered exposed;

    iii.    Promptly notify employees who were close contacts of any known exposure to COVID-19 at the business premises, consistent with applicable confidentiality laws;

    iv.    ensure that the business has a sufficient number of employees to perform the above protocols effectively and timely;

c.    implement temperature screening before an employee enters the business, prior to the start of each shift or, for employees who do not work shifts, before the employee starts work, and send employees home that have an elevated temperature or fever of 100.4 degrees Fahrenheit or higher. Ensure employees practice social distancing while waiting to have temperatures screened;

d.    employees who have symptoms (*i.e.*, fever, cough, or shortness of breath) should notify their supervisor and stay home;

e.    sick employees should follow CDC-recommended steps. Employees should not return to work until the CDC criteria to discontinue home isolation are met, in consultation with healthcare providers and state and local health departments. Employers are encouraged to implement liberal paid time off for employees who do not return to work as set forth above.

(4)    stagger work start and stop times for employees when practicable to prevent gatherings of large groups entering or leaving the premises at the same time;

(5)    provide sufficient amount of space for employees to have breaks and meals while maintaining a social distance of 6 feet, while arranging seating to have employees facing forward and not across from each other in eating and break settings;

(6)    stagger employee break times to reduce the number of employees on break at any given time so that appropriate social distancing of at least 6 feet may be followed;

(7)    limit persons in employee common areas (such as locker or break rooms, dining facilities, training or conference rooms) at any one time to the number of employees that can maintain a social distance of 6 feet;

3

(8)     conduct meetings and trainings virtually (*i.e.*, by phone or through the internet).  If a meeting must be held in person, limit the meeting to the fewest number of employees possible, not to exceed 10 employees at one time, and maintain a social distance of 6 feet;

(9)     provide employees access to regular handwashing with soap, hand sanitizer, and disinfectant wipes and ensure that common areas (including but not limited to break rooms, locker rooms, dining facilities, rest rooms, conference or training rooms) are cleaned on a regular basis, including between any shifts;

(10)    provide masks for employees to wear during their time at the business, and make it a mandatory requirement to wear masks while on  the work site, except to the extent an employee is using break time to eat or drink, in accordance with the guidance from the Department of Health and the CDC. Employers may approve masks obtained or made by employees in accordance with Department of Health guidance;

(11)    ensure that the facility has a sufficient number of employees to perform all measures listed effectively and in a manner that ensures the safety of the public and employees;

(12)    ensure that the facility has a sufficient number of personnel to control access, maintain order, and enforce social distancing of at least 6 feet;

(13)    prohibit non-essential visitors from entering the premises of the business; and

(14)    ensure that all employees are made aware of these required procedures by communicating them, either orally or in writing, in their native or preferred language, as well as in English or by a methodology that allows them to understand.

B.  In addition to the above, the following measures apply to  businesses, other than health care providers, that serve the public within a building or a defined area:

(1) where feasible, businesses should conduct business with the public by appointment only and to the extent that this is not feasible, businesses must limit occupancy to no greater than 50% of the number stated on the applicable certificate of occupancy at any given time, as necessary to reduce crowding in the business, and must maintain a social distance of 6 feet at check-out and counter lines, and must place signage throughout each site to mandate social distancing for both customers and employees;

4

(2) based on the building size and number of employees, alter hours of business so that the business has sufficient time to clean or to restock or both;

(3) install shields or other barriers at registers and check-out areas to physically separate cashiers and customers or take other measures to ensure social distancing of customers from check-out personnel, or close lines to maintain a social distance between of 6 feet between lines;

(4) encourage use of online ordering by providing delivery or pick-up options;

(5) designate a specific time for high-risk and elderly persons to use the business at least once every week if there is a continuing in-person customer-facing component;

(6) require all customers to wear masks while on premises, and deny entry to individuals not wearing masks, unless the business is providing medication, medical supplies, or food, in which case the business must provide alternative methods of pick-up or delivery of such goods; however, individuals who cannot wear a mask due to a medical condition (including children under the age of 2 years per CDC guidance) may enter the premises and are not required to provide documentation of such medical condition;

(7) in businesses with multiple check-out lines, only use every other register, or fewer. After every hour, rotate customers and employees to the previously closed registers. Clean the previously open registers and the surrounding area, including credit card machines, following each rotation;

(8) schedule handwashing breaks for employees at least every hour; and

(9) where carts and handbaskets are available for customers' use, assign an employee to wipe down carts and handbaskets before they become available to each customer entering the premises.

This Order shall take effect immediately and be enforceable as of 8:00 p.m. on April 19, 2020.

_____
Rachel Levine, MD
Secretary of Health

5

Exhibit 2

Pennsylvania Dept. of Health, *Order of the Secretary of Pennsylvania Department of Health Requiring Universal Face Coverings* (July 1, 2020)



# Order of the Secretary of the Pennsylvania Department of Health Requiring Universal Face Coverings

COVID-19 is a contagious disease that is rapidly spreading from person to person. People infected are capable of exposing others to COVID-19 even if their symptoms are mild, such as a cough, or even if they are asymptomatic. Additionally, exposure is possible by touching a surface or object that has the virus on it and then touching one's mouth, nose, or eyes. Symptoms of COVID-19 may include fever, cough, shortness of breath, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell. Early symptoms may also include chills, body aches, sore throat, headache, diarrhea, nausea or vomiting, and runny nose. Older adults and people who have serious chronic medical conditions are at a higher risk for serious illness.

The first cases of COVID-19 were reported in the United States in January 2020. Since then, multiple areas of the United States have experienced "community spread" of COVID-19, meaning that the illness is being transmitted through unknown contact, and not from contacts with known cases. On March 6, 2020, after the first cases of COVID-19 in the Commonwealth of Pennsylvania were confirmed, the Governor issued a Proclamation of Disaster Emergency. Since that date, the number of positive cases has continued to rise, and community spread has continued in the Commonwealth as well. Case counts rapidly increased throughout the Commonwealth in March and April, 2020. As of July 1, 2020, every county in the Commonwealth has been affected, the number of cases is 87,242, and 6,687 individuals have died from COVID-19.

In order to slow the spread and protect the people of the Commonwealth, the Governor and I issued Orders on March 19, 2020, closing all Commonwealth businesses that are not life sustaining. *See Order of the Governor of the Commonwealth of Pennsylvania Regarding the Closure of All Businesses That Are Not Life Sustaining,* as amended; *Order of the Secretary of the Pennsylvania Department of Health Regarding the Closure of All Businesses That Are Not Life Sustaining,* as amended. On April 1, 2020, the Governor and I issued Orders directing all individuals in Pennsylvania to stay at home. *See Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home,* as amended; *Order of the Secretary of the Pennsylvania Department of Health to Stay at Home,* as amended.

In addition, I issued an Order on April 15, 2020, requiring mitigation measures to be applied at businesses that are permitted to engage in in-person operations, including a requirement that all customers wear masks while on premises of businesses that serve the public within a building or a defined area and directs businesses to deny entry to individuals not wearing masks, unless the business is providing medication, medical supplies, or food, in which case the business must provide alternative methods of pick-up or delivery of such goods. Individuals who cannot wear a mask due to a medical condition (including children under the age of 2 years per CDC guidance) are permitted to enter the premises and are not

required to provide documentation of such medical condition. *See Order of the Secretary of the Pennsylvania Department of Health Directing Public Health Safety Measures for Businesses Permitted to Maintain In-person Operations.*

Those mitigation efforts slowed the spread of the disease, protected our hospitals from being overwhelmed, and enabled our hospitals to care for our ill residents. Accordingly, in Orders on May 7, 2020, the Governor and I suspended restrictions for certain areas instituted in the orders on March 19, 2020, as amended, and April 1, 2020, as amended. *See Order of the Governor of the Commonwealth of Pennsylvania for Limited Opening of Business, Lifting of Stay at Home Requirements, and Continued Aggressive Mitigation Efforts, as amended; Order of the Secretary of the Pennsylvania Department of Health for a Limited Opening of Businesses, Lifting of Stay Home Requirements and Continued Aggressive Mitigation Efforts, as amended.*

These mitigation strategies, practiced by all persons in the Commonwealth, have been successful in slowing the spread of the virus, and have allowed the phased and considered reopening of the Commonwealth, *see Order of the Governor of the Commonwealth of Pennsylvania for the Continued Reopening of the Commonwealth of May 27, 2020, as amended; Order of the Secretary for the Continued Reopening of the Commonwealth of May 27, 2020,* as amended. Person-to-person spread does continue however, and with the reopening, the Commonwealth is beginning to see increases in new cases. Mindful of the need to slow this increase, in order to avoid the types of stringent Commonwealth-wide mitigation strategies that were discontinued a short time ago, and in order to avoid the resurgence that is overwhelming the health care systems and public health systems in other states, I am ordering that all persons in the Commonwealth wear face coverings in accordance with this Order. Face coverings can decrease the spread of respiratory droplets from people. *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html#recent-studies. When used in public settings, face coverings will work to reduce the spread of COVID-19 in the Commonwealth.

COVID-19 is a threat to the public's health, for which the Secretary of Health may order general control measures, including, but not limited to, closure, isolation, and quarantine. This authority is granted to the Secretary of Health pursuant to Pennsylvania law. *See* section 5 of the Disease Prevention and Control Law, 35 P.S. § 521.5; sections 2102(a) and 2106 of the Administrative Code of 1929, 71 P.S. §§ 532(a), and 536; and the Department of Health's regulations at 28 Pa. Code §§ 27.60-27.68 (relating to disease control measures; isolation; quarantine; movement of persons subject to isolation or quarantine; and release from isolation and quarantine). Particularly, the Department of Health has the authority to take any disease control measure appropriate to protect the public from the spread of infectious disease. *See* 35 P.S. § 521.5; 71 P.S. § 532(a), and 1403(a); 28 Pa. Code § 27.60.

Accordingly, on this date, July 1, 2020, to protect the public from the spread of COVID-19, I hereby order:

Section 1:     Face Coverings Defined

"Face covering" means a covering of the nose and mouth that is secured to the head with ties, straps, or loops over the ears or is wrapped around the lower face. A "face covering" can be made of a variety of synthetic or natural fabrics, including cotton, silk, or linen. For purposes of this order, a face covering includes a plastic face shield that covers the nose and mouth. "Face coverings" may be factory-made, sewn by hand, or be improvised from household items, including but not limited to, scarfs, bandanas, t-shirts, sweatshirts, or towels. While procedural and surgical masks intended for healthcare providers and first responders meet these requirements, such as N95 respirators, these specialized masks should be reserved for appropriate occupational and health care settings.

Section 2:     Face Coverings Required

Except as provided in Section 3, individuals are required to wear face coverings if they are:

A. outdoors and unable to consistently maintain a distance of six feet from individuals who are not members of their household;

B. in any indoor location where members of the public are generally permitted;

C. waiting for, riding on, driving, or operating public transportation or paratransit or while in a taxi, private car service or ride-sharing vehicle;

D. obtaining services from the healthcare sector in settings including, but not limited to, a hospital, pharmacy, medical clinic, laboratory, physician or dental office, veterinary clinic, or blood bank; or

E. engaged in work, whether at the workplace or performing work off-site, when interacting in-person with any member of the public, working in any space visited by members of the public, working in any space where food is prepared or packaged for sale or distribution to others, working in or walking through common areas, or in any room or enclosed area where other people, except for members of the person's own household or residence, are present when unable to physically distance.

Section 3:     Exceptions to Face Covering Requirement

A. The following are exceptions to the face covering requirement in Section 2:

i.     Individuals who cannot wear a mask due to a medical condition, including those with respiratory issues that impede breathing, mental health condition, or disability;

ii.   Individuals for whom wearing a mask while working would create an unsafe condition in which to operate equipment or execute a task as determined by local, state, or federal regulators or workplace safety guidelines;

iii.   Individuals who would be unable to remove a mask without assistance;

iv.   Individuals who are under two years of age;

v.   Individuals who are communicating or seeking to communicate with someone who is hearing-impaired or has another disability, where the ability to see the mouth is essential for communication;

B.   Individuals are not required to show documentation that an exception applies.

Section 4:   Prior Orders

This Order is intended to be read in concert with my Order Relating to Public Health Safety Measures for Businesses Permitted to Maintain In-person Operations, dated April 15, 2020, and with the Governor's and my Orders for the Continued Reopening of the Commonwealth, dated May 27, 2020.

Section 5:   Effective Date

This Order is effective immediately and will remain in effect until further notice.

Rachel Levine, MD
Secretary of Health

4

Exhibit 3

Office of the Governor, Press Release, *Gov. Wolf Reminds Pennsylvanians: 'Masks are Mandatory'* (Jul. 3, 2020)

# Gov. Wolf Reminds Pennsylvanians: 'Masks are Mandatory'

July 03, 2020

**Press Release,  Public Health**

"Masks are mandatory when leaving the home," Governor Tom Wolf reminded Pennsylvanians today.

"Especially as we are beginning a long Fourth of July weekend, it's critical that everyone remember that masks are mandatory and must be worn when leaving your home," Wolf said. "This virus is not gone, and mask-wearing is a required mitigation effort that we know works to stop its spread."

Sec. of Health Dr. Rachel Levine signed an order mandating mask-wearing on Wednesday. It remains in effect.

FAQs on the mask-wearing order can be found here.

Ver esta página en español.

Exhibit 4

Pennsylvania Dept. of Health, *Updated Order of the Secretary of the Pennsylvania Department of Health Requiring Universal Face Coverings: Frequently Asked Questions* (Nov. 17, 2020)

# Updated Order of the Secretary of the Pennsylvania Department of Health Requiring Universal Face Coverings

## Frequently Asked Questions

Created November 17, 2020; Updated November 23, 2020

View the

[Updated Order of the Secretary of the Pennsylvania Department of Health Requiring Universal Face Coverings](/topics/Documents/Diseases%20and%20Conditions/Updated%20Order%20of%20the%20Secretary%20Requiring%20Universal%20Face%20Coverings.pdf)

**Why did the Secretary re-issue this Order?** The Secretary re-issued this Order to continue to protect all people in the Commonwealth from the spread of COVID-19.

**What type of mask complies with this Order?** The Order requires individuals to wear a "face covering." "Face covering" means covering of the nose and mouth with material that is secured to the head with ties, straps, or loops over the ears or is wrapped around the lower face. A "face covering" can be made of a variety of synthetic or natural fabrics, including cotton, silk or linen. A "face covering" may be factory-made, [sewn by hand, or be improvised from household items ↗](https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-to-make-cloth-face-covering.html), including, but not limited to, scarfs, bandanas, t-shirts, sweatshirts, or towels.

While procedural and surgical masks intended for health care providers and first responders, such as N95 respirators, meet those requirements, these specialized masks should be reserved for appropriate occupational and health care settings.

**Does a disposable face shield suffice in lieu of a mask?** Wearing a cloth face covering is best. A disposable face shield is considered an alternative to a face covering and may be worn when wearing a face covering is otherwise not possible.

**Does the Order apply to individuals within local government facilities, including court houses and government buildings?**Yes. The Order does apply to individuals inside and outside of local government facilities, court houses, and other government buildings.

**What happens if I don't wear a mask?**The wearing of a face covering, such as a mask, helps us as a society to limit the spread of COVID-19 and successfully combat this pandemic; therefore, it is in everyone's best interest that all Pennsylvanians comply with this Order.

As this is a legal Order under the Disease Prevention and Control Law, law enforcement officers are authorized to issue warnings or citations to anyone who does not comply with the Order. The Department of Health can also issue warnings and citations to businesses, persons, facilities, and organizations that do not comply.

**Should I report someone not wearing a mask?  If so, how do I report them?**Individuals should be cautious about reporting individuals who are not wearing a face covering, such as a mask, as individuals may fall under one the exemptions (including having a medical condition that would excuse them from having to wear a face covering). However, if there is a legitimate concern about a situation of non-compliance with the Order, local law enforcement agencies can be contacted through their non-emergency phone numbers to investigate issues of compliance. Individuals should not confront anyone who is not wearing a face covering, take enforcement matters into their own hands, or put themselves in a dangerous situation.

**If I'm inside a public place and can maintain physical distancing, do I need to wear a mask?** Yes. When indoors, individuals must wear a face covering, irrespective of physical distance. If a person is working alone and does not expect to have any interaction with another person, they may remove their face covering.

**Do I have to wear a mask if alone in my workplace or office?**Everyone must wear a face covering when indoors, irrespective of physical distance, however, if a person is working alone, and has no expectation of being around other persons, they do not need to do so.

**What does "working alone" mean?**"Working alone" means when a person is separated from interaction with other people with little or no expectation of in-person interruption. Examples include:

- A lone worker inside the enclosed cab of a crane of construction equipment.
- A lone worker inside an office with four walls and a door.
- A lone worker inside a cubicle with 3 walls and a door or entryway, where walls are high enough to block the breathing zone of all people walking by, and the worker's activity will not require anyone

to come inside that person's workspace.

- A person who is alone in an agricultural field or other open area with no expected contact with others.

**Does the masking requirement apply to workers who are outdoors, and who engage in heavy physical activity, such as employees of solid waste companies and landscapers?**Yes. Individuals must wear a face covering unless working alone or working solely with individuals who are a part of their household. A list of the exceptions can be found in Section 3 of the Order.

**Do I have to wear a mask both inside and outside?**The Order requires individuals to wear a face covering when indoors, irrespective of physical distance. When outdoors, one must wear a face covering when with others who are not members of the person's household and unable to maintain sustained physical distance.

Sustained physical distance  means the practice of staying at least six feet away from others to avoid becoming a

close contact 🔗 (https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-trac-ing-plan/appendix.html#contact) . On October 21, 2020, the Centers for Disease Control and Prevention (CDC) updated its definition of close contact to "someone who was within six feet of an infected person for a cumulative total of 15 minutes or more over a 24-hour period." The guidance goes on to note that there are additional factors to consider when defining "close contact." DOH recommends using 15 consecutive minutes of exposure at a distance of six feet or less as an operational definition for "close contact." However, there are circumstances when someone should be considered a close contact of a case after being within six feet for fewer than 15 consecutive minutes. Additional factors that should be considered when assessing close contacts include but are not limited to close proximity to an infected person, infected person exhibiting symptoms, and environmental conditions like crowds or inadequate ventilation.

**Do I need to wear a mask when around my family members or at a friend's house?**Yes. A face covering is required when indoors and around persons who are not part of the same household. For example, if you are a part of a family of four who is hosting a dinner with extended family, friends or neighbors, all attendees must wear face coverings. If having dinner with just the persons who reside in the same home as you, you do not need to wear face coverings. If outdoors and able to maintain sustained physical distance, face coverings are recommended, but not required.

**Do I have to wear a mask at a restaurant, bar, or private club?**Yes, individuals who are seated at a restaurant or other establishment that offers food and beverage service need to wear a face covering when not eating or drinking.

**Do I have to wear a mask at a house of worship such as a church, synagogue or mosque?**Yes, individuals must wear a face covering inside any public place as well as outdoors when they cannot maintain sustained physical distance from those who are not members of their household.

**Are masks required while driving for work?**Persons must wear a face covering when waiting in a public area for, riding on, driving or operating public transportation or paratransit or while in a taxi, private car service or ride-sharing vehicle. If the person is driving alone or only with members of their household throughout the trip, no face covering, such as a mask, is needed in the vehicle; however, should they need to travel through a drive thru where other persons are present and cannot maintain sustained physical distance, they must wear a face covering.

**Does my ride-share vehicle driver and non-household ride-share vehicle passenger need to wear a mask?**Yes. Persons must wear a face covering when waiting in a public place for, riding on, driving or operating public transportation or paratransit or while in a taxi, private car service or ride-sharing vehicle.

**Does this Order apply to residents in Long-Term Care Facilities or other congregate care settings?**Residents of long-term care facilities, hospitals, correctional settings or other congregate care settings should follow any face covering guidance issued by the Department or agency that regulates those facilities.

**Is it acceptable to remove face coverings when high temperatures and humidity may create unsafe conditions, or simply if the weather is very warm?**Individuals must wear face coverings unless wearing a face covering would create an unsafe condition in which to operate equipment or execute a task as determined by local, state, or federal regulators or workplace safety guidelines. Mere discomfort is not considered a risk to an individual's health or safety. Face shields may be considered an alternative if wearing a cloth face covering is otherwise not possible.

**I have asthma or another medical condition. Do I have to wear a mask?**Individuals must wear a face covering unless they meet one of the exceptions in Section 3 of the Order. Persons, including children, with sensory sensitivities may have challenges wearing a cloth face covering. They should consult with their health care provider for advice about an appropriate alternative.

**When does my child have to wear a mask?** Children two years old and older are required to wear a face covering as required by the Order, unless they qualify for one of the exceptions in Section 3 of the Order. If a child is outdoors and able to consistently maintain a social distance of at least six feet from individuals who are not a part of their household, they do not need to wear a face covering.

If a parent, guardian, or responsible person is unable to place a face covering safely on the child's face, they should not do so. If a child two years old or older is unable to remove a face covering without assistance, the child is not required to wear one.

**Do staff and children in childcare facilities need to wear face coverings?** All staff and children two years old and older must wear face coverings during childcare operations.

Any child who cannot wear a face covering due to a medical condition, including those with respiratory issues that impede breathing, a mental health condition, or disability, and children who would be unable to remove a face covering without assistance, are not required to wear face coverings.

Individuals who are communicating or seeking to communicate with someone who is hearing impaired or who has another disability, where the ability to see the mouth is essential to communication, also are not required to wear a face covering. Alternative face coverings, such as plastic face shields, may also accommodate such disabilities.

**Does the Order apply to children and adults while in schools?** Yes, the Order applies to all students, staff and visitors  two years old and older while in school entities, including public K-12 schools, brick and mortar and cyber charter schools, private and parochial schools, career and technical centers (CTCs), intermediate units (IUs); educational programming for students in non-educational placements such as residential settings (boarding schools), residential facilities, detention centers, and hospital settings; PA Pre-K Counts, Head Start Programs and Preschool Early Intervention programs; Private Academic Nursery Schools and locally funded prekindergarten activities; and post-secondary institutions.

For the safety of students, staff and families and to avoid community spread of COVID-19, students and staff are considered to be members of the public who are congregating in indoor locations. As such, they are required to adhere to the Order.

**Does the updated Order apply to all children?** The updated order applies to all children two years old and older.

**Under what circumstances are students permitted to remove their face coverings?** School entities may allow students to remove face coverings when students are:

- Eating or drinking when spaced at least six feet apart; or
- When wearing a face covering creates an unsafe condition in which to operate equipment or execute a task; or

- At least six feet apart during "face-covering breaks" to last no longer than 10 minutes.

**Do students with disabilities need to wear face coverings?** Children two years old and older are required to wear a face covering unless they have a medical or mental health condition or disability, documented in accordance with Section 504 of the Rehabilitation Act or the Individuals with Disabilities Education Act (IDEA), that precludes the wearing of a face covering in school. Accommodations for such students should be made in partnership with the student's health care provider, school nurse, and Individual Education Plan (IEP)/Section 504 team.

**May a school request evidence that someone qualifies for an exception to the Order?** Schools must require all students over 2 years of age to wear face coverings, except for any student who has a medical or mental health condition or disability that precludes the wearing of a face covering in school. Notwithstanding the exceptions in Section 3 or the Order, schools may require medical documentation. The Pennsylvania Department of Education recommends that any documentation that is provided be in accordance with Section 504 of the Rehabilitation Act or IDEA of such medical or mental health condition or disability.

**Do I need to wear a mask while walking my dog?  Going for a run in the park?** If doing an outdoor solitary activity outside that is not likely to result in being within six feet of another person, you are not required to wear a face covering. Individuals should consider carrying a face covering in case they unexpectantly come within six feet of others for longer than 15 minutes.

**Does the Order require individuals to wear masks when participating in indoor physical activity?** Yes, a person must wear a face covering when participating in indoor physical activity where another person or persons who are not members of the individual's household are present in the same space, irrespective of physical distance. Face coverings need not be worn if the person meets one of the exceptions in Section 3 of the Order.

**Does the Order apply to athletes and sports activities?** Yes. Everyone who participates in sport activities including coaches, athletes (including cheerleaders), and spectators must wear a face covering, such as a mask, unless they fall under an exception in Section 3 of the Order.

**Indoors:** Coaches, athletes (including cheerleaders), and spectators must wear face coverings, when indoors and where another person or persons who are not members of the individual's household are present in the same space, irrespective of physical distance. This includes while actively engaged in workouts, competition, and on the sidelines, etc.

**Outdoors:** Coaches, athletes (including cheerleaders), and spectators must wear face coverings if they cannot maintain sustained physical distance from persons outside of their household. This includes while actively engaged in workouts, competition, and on the sidelines, in the dugout, etc. If sustained six-foot distancing can be maintained, face coverings may be removed when outdoors.

**Can employers make a "no exceptions" or a stricter face covering policy than the Commonwealth?** Yes. An employer that does so will have to review relevant state and Federal employment laws and determine that they are acting within the bounds of those laws.

**Can schools make a "no exceptions" or a stricter face covering policy than the Commonwealth?** Yes, a school entity may make a stricter face covering policy. However, reasonable accommodations must be made for students, staff, employees and visitors who state they have a medical condition, mental health condition, or disability that makes it unreasonable for the person to maintain a face covering.

**The Order says businesses and schools must provide "reasonable accommodations" what does that mean?** Businesses should consult with legal counsel to determine reasonable accommodations.

**Can a business deny entry to a _customer_ who is not wearing a face covering?** Yes, if a customer is not wearing a face covering a business should deny entry; however, that business must offer a reasonable accommodation for the customer to purchase goods. State and Federal law, including the Americans with Disabilities Act (ADA), may also create obligations for businesses or employers. Businesses should talk to their legal representatives for specific advice.

**Can a business deny entry to an _employee_ who is not wearing a face covering?** All employees must wear a face covering, such as a mask in the workplace unless they qualify for an exception in Section 3 of the Order. The administration does not dictate to employers how they should manage their workforce; however, employers should follow all applicable laws including the ADA and consult with their legal representatives for legal advice.

**Can a business deny entry and not provide a reasonable accommodation?** Businesses should seek advice from their legal counsel regarding whether reasonable accommodations must be offered.

**The Order says, "Mitigate or eliminate employee, teacher, student and customer exposure to people who cannot wear or refuse to wear a face covering." What does that mean?** If a business or school has an employee, teacher, student, or customer who cannot wear a face covering, the business or school should employ additional mitigation efforts to keep their staff safe such as providing Plexiglas shields, offering services outdoors, adjusting schedules, or additional physical distancing opportunities.

**The Order no longer says, "Individuals are not required to show documentation that an exception applies." Does that mean a business can ask me for a medical excuse? Can my employer now require me to provide proof of a medical condition?** Exemptions from the Order can be found in Section 3 of the Order. When a customer or visitor claims to be exempt due to a medical or mental health condition or disability, businesses may not require proof of the condition or disability or require customers or visitors to explain the nature of their condition.

**When will I be required to follow the terms of this Order, and for how long?** The updated Order is effective immediately and will remain in effect until the Secretary of Health determines the public health risk is sufficiently reduced so that face coverings are no longer necessary as a widely utilized public health tool.

**Can an athlete remove their mask during play if the mask causes a medical condition, including respiratory issues that impede breathing?**

Yes, the Order provides an exception in section 3 that provides that if wearing a face covering would either cause a medical condition, or exacerbate an existing one, including respiratory issues that impede breathing, a mental health condition or a disability.  The order indicates all alternatives to wearing a face covering, including the use of a face shield, should be exhausted before an individual is excepted from this Order.

Using football as an example, wearing a mask in addition to a mouth guard and a helmet would likely create a medical issue for the athlete whether the athlete is a professional or youth player even if a previous medical issue was not present. For example, the CDC says that "wearing a mask with these types of protective equipment is not safe if it makes it hard to breathe." There are other sports where there are similar concerns that a mask would create a medical issue where one would otherwise not exist in an athlete. For example, it should also be obvious that wearing a mask while swimming presents an imminent health issue.

According to Section 3, the athlete would be asked to work through alternatives that would reduce or eliminate the respiratory droplets that would impact others in proximity. If the sport, equipment, or exertion level does not allow for face covering to be worn safely then the athlete should not wear a face covering.

There are no exemptions for specific sports, leagues, teams, or levels. We know that some people don't like masks. We are asking everyone to please give this their best effort so we can continue these activities and others as we all unite to fight COVID-19.

Exhibit 5

Centers for Disease Control and Prevention, *Requirement for Persons to Wear Masks While On Conveyances and Transportation Hubs* (Jan. 29, 2021)

CENTERS FOR DISEASE CONTROL AND PREVENTION
DEPARTMENT OF HEALTH AND HUMAN SERVICES

ORDER UNDER SECTION 361
OF THE PUBLIC HEALTH SERVICE ACT (42 U.S.C. 264)
AND 42 CODE OF FEDERAL REGULATIONS 70.2, 71.31(b), 71.32(b)

REQUIREMENT FOR PERSONS TO WEAR MASKS
WHILE ON CONVEYANCES AND AT TRANSPORTATION HUBS

SUMMARY:

Notice and Order; and subject to the limitations under "Applicability," pursuant to 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), and 71.32(b):

(1) Persons[1] must wear[2] masks over the mouth and nose when traveling on conveyances into and within the United States. Persons must also wear masks at transportation hubs as defined in this Order.

(2) A conveyance operator transporting persons into and within the United States[3] must require all persons onboard to wear masks for the duration of travel.

(3) A conveyance operators operating a conveyance arriving at or departing from a U.S. port of entry must require all persons on board to wear masks for the duration of travel as a condition of controlled free pratique.[4]

(4) Conveyance operators must use best efforts to ensure that any person on the conveyance wears a mask when boarding, disembarking, and for the duration of travel. Best efforts include:

- boarding only those persons who wear masks;
- instructing persons that Federal law requires wearing a mask on the conveyance and failure to comply constitutes a violation of Federal law;
- monitoring persons onboard the conveyance for anyone who is not wearing a mask and seeking compliance from such persons;
- at the earliest opportunity, disembarking any person who refuses to comply; and
- providing persons with prominent and adequate notice to facilitate awareness and compliance of the requirement of this Order to wear a mask; best practices may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email;

---

[1] As used in this Order, "persons" includes travelers (*i.e.*, passengers and crew), conveyance operators, and any workers or service providers in the transportation hub.
[2] To "wear a mask" means to wear a mask over the nose and mouth.
[3] This includes international, interstate, or intrastate waterways, subject to the jurisdiction of the United States.
[4] As a condition of this controlled free pratique to commence or continue operations in the United States, conveyance operators must additionally require all persons to wear masks on board conveyances departing from the United States and for the duration of their travel until the conveyance arrives at the foreign destination if at any time any of the persons on the conveyance (passengers, crew, or conveyance operators) will return to the United States while this Order remains in effect. This precaution must be followed regardless of scheduled itinerary.

1

posted signage in multiple languages with illustrations; printing the requirement on
transit tickets; or other methods as appropriate.

(5) Operators of transportation hubs must use best efforts to ensure that any person entering or on
the premises of the transportation hub wears a mask. Best efforts include:

- allowing entry only to those persons who wear masks;
- instructing persons that Federal law requires wearing a mask in the transportation hub
  and failure to comply constitutes a violation of Federal law;
- monitoring persons on the premises of the transportation hub for anyone who is not wear-
  ing a mask and seeking compliance from such persons;
- at the earliest opportunity, removing any person who refuses to comply from the premises
  of the transportation hub; and
- providing persons with prominent and adequate notice to facilitate awareness and compli-
  ance with the requirement of this Order to wear a mask; best practices may include, if
  feasible, advance notifications on digital platforms, such as on apps, websites, or email;
  posted signage in multiple languages with illustrations; printing the requirement on
  transit tickets; or other methods as appropriate.


DEFINITIONS:

*Controlled free pratique* shall have the same definition as under 42 CFR 71.1, meaning "permis-
sion for a carrier to enter a U.S. port, disembark, and begin operation under certain stipulated
conditions."

*Conveyance* shall have the same definition as under 42 CFR 70.1, meaning "an aircraft, train,
road vehicle,[5] vessel . . . or other means of transport, including military." Included in the defini-
tion of "conveyance" is the term "carrier" which under 42 CFR 71.1 has the same definition as
conveyance under 42 CFR 70.1.

*Conveyance operator* means an individual operating a conveyance and an individual or organiza-
tion causing or authorizing the operation of a conveyance.

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields.[6]

*Interstate traffic* shall have the same definition as under 42 CFR 70.1, meaning

---

[5] This includes rideshares meaning arrangements where passengers travel in a privately owned road vehicle driven
by its owner in connection with a fee or service.
[6] A properly worn mask completely covers the nose and mouth of the wearer. A mask should be secured to the head,
including with ties or ear loops. A mask should fit snugly but comfortably against the side of the face. Masks do not
include face shields. Masks can be either manufactured or homemade and should be a solid piece of material without
slits, exhalation valves, or punctures. Medical masks and N-95 respirators fulfill the requirements of this Order.
CDC guidance for attributes of acceptable masks in the context of this Order is available at:
https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html

"(1):

> (i) The movement of any conveyance or the transportation of persons or property, including any portion of such movement or transportation that is entirely within a state or possession–

> (ii) From a point of origin in any state or possession to a point of destination in any other state or possession; or

> (iii) Between a point of origin and a point of destination in the same state or possession but through any other state, possession, or contiguous foreign country.

(2) Interstate traffic does not include the following:

> (i) The movement of any conveyance which is solely for the purpose of unloading persons or property transported from a foreign country or loading persons or property for transportation to a foreign country.

> (ii) The movement of any conveyance which is solely for the purpose of effecting its repair, reconstruction, rehabilitation, or storage."

*Intrastate traffic* means the movement of any conveyance or the transportation or movement of persons occurring solely within the boundaries of a state or territory, or on tribal land.

*Possession* shall have the same definition as under 42 CFR 70.1 and 71.1, meaning a "U.S. territory."

*State* shall have the same definition as under 42 CFR 70.1, meaning "any of the 50 states, plus the District of Columbia."

*Territory* shall have the same definition as "U.S. territory" under 42 CFR 70.1 and 71.1, meaning "any territory (also known as possessions) of the United States, including American Samoa, Guam, the [Commonwealth of the] Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands."

*Transportation hub* means any airport, bus terminal, marina, seaport or other port, subway station, terminal (including any fixed facility at which passengers are picked-up or discharged), train station, U.S. port of entry, or any other location that provides transportation subject to the jurisdiction of the United States.

*Transportation hub operator* means an individual operating a transportation hub and an individual or organization causing or authorizing the operation of a transportation hub.

*U.S. port* shall have the same definition as under 42 CFR 71.1, meaning any "seaport, airport, or border crossing point under the control of the United States."


STATEMENT OF INTENT:

3

This Order shall be interpreted and implemented in a manner as to achieve the following objectives:

- Preservation of human life;
- Maintaining a safe and secure operating transportation system;
- Mitigating the further introduction, transmission, and spread of COVID-19 into the United States and from one state or territory into any other state or territory; and
- Supporting response efforts to COVID-19 at the Federal, state, local, territorial, and tribal levels.

APPLICABILITY:

This Order shall not apply within any state, locality, territory, or area under the jurisdiction of a Tribe that (1) requires a person to wear a mask on conveyances; (2) requires a person to wear a mask at transportation hubs; and (3) requires conveyances to transport only persons wearing masks. Such requirements must provide the same level of public health protection as — or greater protection than —the requirements listed herein.

In addition, the requirement to wear a mask shall not apply under the following circumstances:

- While eating, drinking, or taking medication, for brief periods;
- While communicating with a person who is hearing impaired when the ability to see the mouth is essential for communication;
- If, on an aircraft, wearing of oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation;
- If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance;[7] or
- When necessary to temporarily remove the mask to verify one's identity such as during Transportation Security Administration screening or when asked to do so by the ticket or gate agent or any law enforcement official.

This Order exempts the following categories of persons:[8]

---

[7] Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask. Persons who are vomiting should remove the mask until vomiting ceases. Persons with acute illness may remove the mask if it interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

[8] Operators of conveyances or transportation hubs may impose requirements, or conditions for carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the operator, as well as require evidence that the person does not have COVID-19 such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19. CDC definitions for SARS-CoV-2 viral test and documentation of recovery are available in the Frequently Asked Questions at: https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html. Operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or transportation hub. Operators may further require that persons seeking exemption from the requirement to wear a mask request an accommodation in advance.

4

- A child under the age of 2 years;
- A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).[9]
- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

This Order exempts the following categories of conveyances, including persons on board such conveyances:

- Private conveyances operated solely for personal, non-commercial use;
- Commercial motor vehicles or trucks as these terms are defined in 49 CFR 390.5, if the driver is the sole occupant of the vehicle or truck;
- Conveyances operated or chartered by the U.S. military services provided that such conveyance operators observe Department of Defense precautions to prevent the transmission of COVID-19 that are equivalent to the precautions in this Order.

This Order applies to persons on conveyances and at transportation hubs directly operated by U.S. state, local, territorial, or tribal government authorities, as well as the operators themselves. U.S. state, local, territorial, or tribal government authorities directly operating conveyances and transportation hubs may be subject to additional federal authorities or actions, and are encouraged to implement additional measures enforcing the provisions of this Order regarding persons traveling onboard conveyances and at transportation hubs operated by these government entities.

To the extent permitted by law, and consistent with President Biden's Executive Order of January 21, 2021 (Promoting COVID-19 Safety in Domestic and International Travel),[10] Federal agencies are required to implement additional measures enforcing the provisions of this Order.

BACKGROUND:

There is currently a pandemic of respiratory disease (coronavirus disease 2019 or "COVID-19") caused by a novel coronavirus (SARS-COV-2). As of January 27, 2021, there have been 99,638,507 confirmed cases of COVID-19 globally, resulting in more than 2,141,000 deaths. As of January 27, 2021, there have been over 25,000,000 cases identified in the United States and over 415,000 deaths due to the disease. New SARS-CoV-2 variants have emerged in recent weeks, including at least one with evidence of increased transmissibility.[11]

The virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet) mainly through respiratory droplets

---

[9] This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability. CDC will issue additional guidance regarding persons who cannot wear a mask under this exemption. https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html

[10] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/21/executive-order-promoting-covid-19-safety-in-domestic-and-international-travel/

[11] https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/scientific-brief-emerging-variants.html

produced when an infected person coughs, sneezes, or talks. These droplets can land in the mouths, eyes, or noses of people who are nearby and possibly be inhaled into the lungs. Infected people without symptoms (asymptomatic) and those in whom symptoms have not yet developed (pre-symptomatic) can also spread the virus. In general, the more closely an infected person interacts with others and the longer those interactions, the higher the risk of COVID-19 spread. COVID-19 may be transmitted by touching surfaces or objects that have the virus on them and then touching one's own or another person's eyes, nose, or mouth.

Masks help prevent people who have COVID-19, including those who are pre-symptomatic or asymptomatic, from spreading the virus to others.[12] Masks are primarily intended to reduce the emission of virus-laden droplets, i.e., they act as source control by blocking exhaled virus.[13] This is especially relevant for asymptomatic or pre-symptomatic infected wearers who feel well and may be unaware of their infectiousness to others, and who are estimated to account for more than 50% of transmissions.[14,15] Masks also provide personal protection to the wearer by reducing inhalation of these droplets, i.e., they reduce wearers' exposure through filtration.[16] The community benefit of wearing masks for SARS-CoV-2 control is due to the combination of these effects; individual prevention benefit increases with increasing numbers of people using masks consistently and correctly.

Appropriately worn masks reduce the spread of COVID-19—particularly given the evidence of pre-symptomatic and asymptomatic transmission of COVID-19.  Seven studies have confirmed the benefit of universal masking in community level analyses: in a unified hospital system,[17] a  German city,[18] a U.S. State,[19] a panel of 15 U.S. States and Washington, D.C.,[20,21] as

[12] https://www.cdc.gov/coronavirus/2019-ncov/more/masking-science-sars-cov2.html

[13] Leung NHL, Chu DKW, Shiu EYC, et al. Respiratory virus shedding in exhaled breath and efficacy of face masks. *Nature Medicine.* 2020;26(5):676-680.https://dx.doi.org/10.1038/s41591-020-0843-2

[14] Moghadas SM, Fitzpatrick MC, Sah P, et al. The implications of silent transmission for the control of COVID-19 outbreaks. *Proc Natl Acad Sci U S A.* 2020;117(30):17513-17515.10.1073/pnas.2008373117. https://www.ncbi.nlm.nih.gov/pubmed/32632012

[15] Johansson MA, Quandelacy TM, Kada S, et al. SARS-CoV-2 Transmission From People Without COVID-19 Symptoms. Johansson MA, et al. JAMA Netw Open. 2021 Jan 4;4(1):e2035057. doi: 10.1001/jamanetworko-pen.2020.35057.

[16] Ueki H, Furusawa Y, Iwatsuki-Horimoto K, et al. Effectiveness of Face Masks in Preventing Airborne Transmission of SARS-CoV-2. *mSphere.* 2020;5(5).10.1128/mSphere.00637-20. https://www.ncbi.nlm.nih.gov/pubmed/33087517

[17] Wang X, Ferro EG, Zhou G, Hashimoto D, Bhatt DL. Association Between Universal Masking in a Health Care System and SARS-CoV-2 Positivity Among Health Care Workers. *JAMA.* 2020.10.1001/jama.2020.12897. https://www.ncbi.nlm.nih.gov/pubmed/32663246

[18] Mitze T., Kosfeld R., Rode J., Wälde K. *Face Masks Considerably Reduce COVID-19 Cases in Germany: A Synthetic Control Method Approach.* IZA – Institute of Labor Economics (Germany);2020.ISSN: 2365-9793, DP No. 13319. http://ftp.iza.org/dp13319.pdf

[19] Gallaway MS, Rigler J, Robinson S, et al. Trends in COVID-19 Incidence After Implementation of Mitigation Measures – Arizona, January 22-August 7, 2020. *MMWR Morb Mortal Wkly Rep.* 2020;69(40):1460-1463.10.15585/mmwr.mm6940e3. https://www.ncbi.nlm.nih.gov/pubmed/33031366

[20] Lyu W, Wehby GL. Community Use Of Face Masks And COVID-19: Evidence From A Natural Experiment Of State Mandates In The US. *Health Aff (Millwood).* 2020;39(8):1419-1425.10.1377/hlthaff.2020.00818. https://www.ncbi.nlm.nih.gov/pubmed/32543923

[21] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.gold-mansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

well as both Canada[22] and the United States[23] nationally. Each analysis demonstrated that, following directives from organizational and political leadership for universal masking, new infections fell significantly. Two of these studies[24,25] and an additional analysis of data from 200 countries that included localities within the United States[26] also demonstrated reductions in mortality. An economic analysis using U.S. data found that, given these effects, increasing universal masking by 15% could prevent the need for lockdowns and reduce associated losses of up to $1 trillion or about 5% of gross domestic product.[27]

Wearing a mask especially helps protect those at increased risk of severe illness from COVID-19[28] and workers who frequently come into close contact with other people (e.g., at transportation hubs). Masks are most likely to reduce the spread of COVID-19 when they are widely used by people in public settings. Using masks along with other preventive measures, including social distancing, frequent handwashing, and cleaning and disinfecting frequently touched surfaces, is one of the most effective strategies available for reducing COVID-19 transmission.

Traveling on multi-person conveyances increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces. Air travel often requires spending time in security lines and crowded airport terminals. Social distancing may be difficult if not impossible on flights.  People may not be able to distance themselves by the recommended 6 feet from individuals seated nearby or those standing in or passing through the aircraft's aisles. Travel by bus, train, vessel, and other conveyances used for international, interstate, or intrastate transportation pose similar challenges.

Intrastate transmission of the virus has led to—and continues to lead to—interstate and international spread of the virus, particularly on public conveyances and in travel hubs, where passengers who may themselves be traveling only within their state or territory commonly interact with others traveling between states or territories or internationally. Some states, territories, Tribes,

[22] Karaivanov A., Lu S.E., Shigeoka H., Chen C., Pamplona S. *Face Masks, Public Policies and Slowing the Spread of Covid-19: Evidence from Canada* National Bureau of Economic Research 2020.Working Paper 27891. http://www.nber.org/papers/w27891

[23] Chernozhukov V, Kasahara H, Schrimpf P. Causal Impact of Masks, Policies, Behavior on Early Covid-19 Pandemic in the U.S. J Econom. 2021 Jan;220(1):23-62. doi: 10.1016/j.jeconom.2020.09.003. Epub 2020 Oct 17.

[24] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.gold-mansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

[25] Chernozhukov V, Kasahara H, Schrimpf P. Causal Impact of Masks, Policies, Behavior on Early Covid-19 Pandemic in the U.S. J Econom. 2021 Jan;220(1):23-62. doi: 10.1016/j.jeconom.2020.09.003. Epub 2020 Oct 17.

[26] Leffler CT, Ing EB, Lykins JD, Hogan MC, McKeown CA, Grzybowski A. Association of country-wide coronavirus mortality with demographics, testing, lockdowns, and public wearing of masks. Am J Trop Med Hyg. 2020 Dec;103(6):2400-2411. doi: 10.4269/ajtmh.20-1015. Epub 2020 Oct 26.

[27] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.gold-mansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

[28] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html

and local public health authorities have imposed mask-wearing requirements within their juris-dictional boundaries to protect public health.[29] Any state or territory without sufficient mask-wearing requirements for transportation systems within its jurisdiction has not taken adequate measures to prevent the spread of COVID-19 from such state or territory to any other state or territory. That determination is based on, *inter alia*, the rapid and continuing transmission of the virus across all states and territories and across most of the world. Furthermore, given how inter-connected most transportation systems are across the nation and the world, local transmission can grow even more quickly into interstate and international transmission when infected persons travel on non-personal conveyances without wearing a mask and with others who are not wear-ing masks.

Therefore, I have determined that the mask-wearing requirements in this Order are reasonably necessary to prevent the further introduction, transmission, or spread of COVID-19 into the United States and among the states and territories. Individuals traveling into or departing from the United States, traveling interstate, or traveling entirely intrastate, conveyance operators that transport such individuals, and transportation hub operators that facilitate such transporta-tion, must comply with the mask-wearing requirements set forth in this Order.

America's transportation systems are essential. Not only are they essential for public health, they are also essential for America's economy and other bedrocks of American life. Those transportation systems carry life-saving medical supplies and medical providers into and across the nation to our hospitals, nursing homes, and physicians' offices. Trains, planes, ships, and automobiles bring food and other essentials to our communities and to our homes. Buses bring America's children and teachers to school. Buses, trains, and subways, bring America's workforce to their jobs.

Requiring masks on our transportation systems will protect Americans and provide confidence that we can once again travel safely even during this pandemic. Therefore, requiring masks will help us control this pandemic and aid in re-opening America's economy.

The United States and countries around the world are currently embarking on efforts to vac-cinate their populations, starting with healthcare personnel and other essential workers at in-creased risk of exposure to SARS-CoV-2 and people at increased risk for severe illness from the virus. While vaccines are highly effective at preventing severe or symptomatic COVID-19, at this time there is limited information on how much the available COVID-19 vaccines may reduce transmission in the general population and how long protection lasts.[30] Therefore, this mask requirement, as well as CDC recommendations to prevent spread of COVID-19,[31] additionally apply to vaccinated persons. Similarly, CDC recommends that people who have

---

[29] Based on internet sources, 37 states plus D.C. and Puerto Rico mandate the wearing of masks in public. Among the jurisdictions that have imposed mask mandates, variations in requirements exist. For example, exemptions for children range in cutoff age from 2 to 12, but masks are generally required in indoor public spaces such as restau-rants and stores, on public transit and ride-hailing services, and outdoors when unable to maintain 6 feet of distance from others. *See* https://www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html (ac-cessed January 28, 2021).
[30] https://www.cdc.gov/vaccines/covid-19/info-by-product/clinical-considerations.html
[31] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

recovered from COVID-19 continue to take precautions to protect themselves and others, including wearing masks;[32] therefore, this mask requirement also applies to people who have recovered from COVID-19.

ACTION:

Until further notice, under 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), and 71.32(b), unless excluded or exempted as set forth in this Order, a person must wear a mask while boarding, disembarking, and traveling on any conveyance into or within the United States. A person must also wear a mask at any transportation hub that provides transportation within the United States.

Conveyance operators traveling into or within the United States may transport only persons wearing masks and must use best efforts to ensure that masks are worn when embarking, disembarking, and throughout the duration of travel. Operators of transportation hubs must use best efforts to ensure that any person entering or on the premises of the transportation hub wears a mask.

As a condition of receiving controlled free pratique under 42 CFR 71.31(b) to enter a U.S. port, disembark passengers, and begin operations at any U.S. port of entry, conveyances arriving into the United States must require persons to wear masks while boarding, disembarking, and for the duration of travel. Conveyance operators must also require all persons to wear masks while boarding and for the duration of their travel on board conveyances departing from the United States until the conveyance arrives at the foreign destination, if at any time any of the persons onboard (passengers, crew, or conveyance operators) will return to the United States while this Order remains in effect. These travel conditions are necessary to mitigate the harm of further introduction of COVID-19 into the United States.

Requiring a properly worn mask is a reasonable and necessary measure to prevent the introduction, transmission and spread of COVID-19 into the United States and among the states and territories under 42 U.S.C. 264(a) and 42 CFR 71.32(b). Among other benefits, masks help prevent dispersal of an infected person's respiratory droplets that carry the virus. That precaution helps prevent droplets from landing in the eye, mouth, or nose or possibly being inhaled into the lungs of an uninfected person, or from landing on a surface or object that an uninfected person may then touch and then touch his or her own or another's eyes, nose, or mouth. Masks also provide some protection to the wearer by helping reduce inhalation of respiratory droplets.

This Order shall not apply within any state, locality, territory, or area under the jurisdiction of a Tribe, where the controlling governmental authority: (1) requires a person to wear a mask on conveyances; (2) requires a person to wear a mask at transportation hubs; and (3) requires conveyances to transport only persons wearing masks. Those requirements must provide the same level of public health protection as —or greater protection than—the requirements listed herein.

In accordance with 42 U.S.C. 264(e), state, local, territorial, and tribal authorities may impose additional requirements that provide greater public health protection and are more restrictive than

---

[32] https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html

the requirements in this Order. Consistent with other federal, state, or local legal requirements, this Order does not preclude operators of conveyances or transportation hubs from imposing additional requirements, or conditions for carriage, that provide greater public health protection and are more restrictive than the requirements in this Order (e.g., requiring a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or imposing requirements for social distancing or other recommended protective measures).

This Order is not a rule within the meaning of the Administrative Procedure Act ("APA") but rather is an emergency action taken under the existing authority of 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), 71.32(b). In the event that a court determines this Order qualifies as a rule under the APA, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and comment and the opportunity to comment on this Order and the delay in effective date. Considering the public health emergency caused by COVID-19, it would be impracticable and contrary to the public's health, and by extension the public's interest, to delay the issuance and effective date of this Order. Similarly, the Office of Information and Regulatory Affairs has determined that if this Order were a rule, it would be a major rule under the Congressional Review Act, but there would not be a delay in its effective date as the agency has determined that there would be good cause to make the requirements herein effective immediately under the APA.

This order is also an economically significant regulatory action under Executive Order 12866 and has therefore been reviewed by the Office of Information and Regulatory Affairs of the Office of Management and Budget. The agency is proceeding without the complete analysis required by Executive Order 12866 under the emergency provisions of 6(a)(3)(D) of that Order.

If any provision of this Order, or the application of any provision to any carriers, conveyances, persons, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any carriers, conveyances, persons, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

To address the COVID-19 public health threat to transportation security, this Order shall be enforced by the Transportation Security Administration under appropriate statutory and regulatory authorities including the provisions of 49 U.S.C. 106, 114, 44902, 44903, and 46301; and 49 CFR part 1503, 1540.105, 1542.303, 1544.305 and 1546.105.

This Order shall be further enforced by other federal authorities and may be enforced by cooperating state and local authorities through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 70.18 and 71.2.[33]

---

[33] While this Order may be enforced and CDC reserves the right to enforce through criminal penalties, CDC does not intend to rely primarily on these criminal penalties but instead strongly encourages and anticipates widespread voluntary compliance as well as support from other federal agencies in implementing additional civil measures enforcing the provisions of this Order, to the extent permitted by law and consistent with President Biden's Executive Order of January 21, 2021 (Promoting COVID-19 Safety in Domestic and International Travel).

EFFECTIVE DATE:

This Order shall enter into effect on February 1, 2021, at 11:59 p.m. and will remain in effect un-
less modified or rescinded based on specific public health or other considerations, or until the
Secretary of Health and Human Services rescinds the determination under section 319 of the
Public Health Service Act (42 U.S.C. 247d) that a public health emergency exists.

In testimony whereof, the Director of the Division of Global Migration and Quarantine at the
Centers for Disease Control and Prevention, U.S. Department of Health and Human Services,
has hereunto set his hand at Atlanta, GA, this 29th day of January 2021.

Martin S. Cetron, M.D.
Director, Division of Global Migration and Quarantine
Centers for Disease Control and Prevention

Exhibit 6

Centers for Disease Control and Prevention, *Your Guide to Masks* (updated Feb. 22, 2021)




# COVID-19


**WEAR A MASK**


**STAY 6 FEET APART**


**AVOID CROWDS**


**GET A VACCINE**

# Your Guide to Masks

Updated Feb. 22, 2021     Print

CDC recommends that people wear masks in public settings, at events and gatherings, and anywhere they will be around other people. Effective February 2, 2021, masks are required on planes, buses, trains, and other forms of public transportation traveling into, within, or out of the United States and in U.S. transportation hubs such as airports and stations.

# How to Select

When selecting a mask, there are many choices. Here are some do's and don'ts.

| DO choose masks that | DO NOT choose masks that |
|---|---|

 Have two or more layers of washable, breathable fabric

 Completely cover your nose and mouth

 Fit snugly against the sides of your face and don't have gaps

 Have a nose wire to prevent air from leaking out of the top of the mask

 Are made of fabric that makes it hard to breathe, for example, vinyl

 Have exhalation valves or vents which allow virus particles to escape

 Are intended for healthcare workers, including N95 respirators

# Special Considerations

## Gaiters & face shields

Wear a gaiter with two layers, or fold it to make two layers

Not recommended: Evaluation of face shields is ongoing, but effectiveness is unknown at this time.

 

## Children



Find a mask that is made for children to help ensure proper fit



Check to be sure the mask fits snugly over the nose and mouth and under the chin and that there are no gaps around the sides



Do NOT put on children younger than 2 years old

## Cold weather gear



Wear your scarf, ski mask or balaclava over your mask



Scarves, ski masks and balaclavas are not substitutes for masks

For more information on evidence for effectiveness of masks, other types of face protection, and mask alternatives, see Considerations for Wearing Masks

# How to Wear

Wear a mask **correctly** and **consistently** for the best protection.

- Be sure to wash your hands or use hand sanitizer before putting on a mask.
- Do **NOT** touch the mask when wearing it. If you have to often touch/adjust your mask, it doesn't fit you properly, and you may need to find a different mask or make adjustments.

For more information, visit our How to Wear Masks web page.

## Do wear a mask that



- Covers your nose and mouth and secure it under your chin.
- Fits snugly against the sides of your face.

## How NOT to wear a mask


Around your neck


On your forehead


Under your nose


Only on your nose


On your chin


Dangling from one ear


On your arm

## How to take off a mask


① Carefully, untie the strings behind your head or stretch the ear loops


② Handle only by the ear loops or ties


③ Fold the outside corners together


④ Be careful not to touch your eyes, nose, and mouth when removing and wash hands immediately after removing

## How to Clean

Reusable masks should be washed regularly. Always remove masks correctly and wash your hands after handling or touching a used mask.

- Include your mask with your regular laundry
- Use regular laundry detergent and the warmest appropriate water setting for the cloth used to make the mask
- Use the highest heat setting and leave in the dryer until completely dry

For more information, visit our How to Wash Masks web page.



For more information, see our Masks web site. For information on the sources for our mask guidance, see Recent Studies.

Last Updated Feb. 22, 2021

Exhibit 7

Centers for Disease Control and Prevention, *How to Store and Wash Masks* (Oct. 28, 2020)

 

   

## COVID-19

WEAR A MASK        STAY 6 FEET APART        AVOID CROWDS        GET A VACCINE

# How to Store and Wash Masks

Updated Oct. 28, 2020        Print

Store your cloth mask properly and wash it regularly to keep it clean. Consider having more than one mask on hand so that you can easily replace a dirty mask with a clean one. Make sure to remove your mask correctly and wash your hands after touching a used mask.

# Store your mask

## Store wet or dirty masks in a plastic bag



If your mask is wet or dirty from sweat, saliva, make-up, or other liquids or substances, keep it in a sealed plastic bag until you can wash it. Wash wet or dirty masks as soon as possible to prevent them from becoming moldy. Wet masks can be hard to breathe through and are less effective than dry masks.

## Store masks that are not wet or dirty in a paper bag

You can store your mask temporarily to reuse later. Remove your mask correctly and wash your hands after touching a used mask. Keep it in a dry, breathable bag (like a paper or mesh fabric bag) to keep it clean between uses. When reusing your mask, keep the same side facing out.

If you are taking off your mask to eat or drink outside of your home, you can place it somewhere safe to keep it clean, such as your pocket, purse, or paper bag. Make sure to wash or sanitize your hands after removing your mask. After eating, put the mask back on with the same side facing out. Be sure to wash or sanitize your hands again after putting your mask back on.

# Wash your mask

Wash your cloth mask whenever it gets dirty or at least daily. If you have a disposable face mask, throw it away after wearing it once.

## Using a washing machine

- Include your mask with your regular laundry.
- Use regular laundry detergent and the appropriate settings according to the fabric label.



**By hand**

- Wash your mask with tap water and laundry detergent or soap.
- Rinse thoroughly with clean water to remove detergent or soap.



# Dry your mask

### Dryer

- Dry your mask completely in a warm or hot dryer



### Air dry

- Hang your mask in direct sunlight to dry completely. If you cannot hang it in direct sunlight, hang or lay it flat and let it dry completely.



## More Information

Your Guide to Masks

Masks Protect You & Me

How to Wear Your Mask

Improve How Your Mask Protects You

Types of Masks

I Wear a Mask Because

Last Updated Oct. 28, 2020

Exhibit 8

Governor Tom Wolf, *Proclamation of Disaster Emergency* (Mar. 6, 2020 and extended on June 3, 2020, Aug. 31, 2020, Nov. 24, 2020, and Feb. 19, 2021)



COMMONWEALTH OF PENNSYLVANIA

OFFICE OF THE GOVERNOR

*PROCLAMATION OF DISASTER EMERGENCY*

*March 6, 2020*

**WHEREAS**, a novel coronavirus (now known as "COVID-19") emerged in Wuhan, China, began infecting humans in December 2019, and has since spread to 89 countries, including the United States; and

**WHEREAS**, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared COVID-19 a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and

**WHEREAS**, the Commonwealth of Pennsylvania ("Commonwealth") has been working in collaboration with the CDC, HHS, and local health agencies since December 2019 to monitor and plan for the containment and subsequent mitigation of COVID-19; and

**WHEREAS**, on February 1, 2020, the Commonwealth's Department of Health activated its Department Operations Center at the Pennsylvania Emergency Management Agency's headquarters to conduct public health and medical coordination for COVID-19 throughout the Commonwealth; and

**WHEREAS**, on March 4, 2020, the Director of the Pennsylvania Emergency Management Agency ordered the activation of its Commonwealth Response Coordination Center in support of the Department of Health's Department Operations Center, to maintain situational awareness and coordinate the response to any potential COVID-19 impacts across the Commonwealth; and

**WHEREAS**, as of March 6, 2020, there are 233 confirmed and/or presumed positive cases of COVID-19 in the United States, including 2 presumed positive cases in the Commonwealth; and

**WHEREAS**, while it is anticipated that a high percentage of those affected by COVID-19 will experience mild influenza-like symptoms, COVID-19 is a disease capable of causing severe symptoms or loss of life, particularly to older populations and those individuals with pre-existing conditions; and

**WHEREAS**, it is critical to prepare for and respond to suspected or confirmed cases in the Commonwealth and to implement measures to mitigate the spread of COVID-19; and

**WHEREAS**, with 2 presumed positive cases in the Commonwealth as of March 6, 2020, the possible increased threat from COVID-19 constitutes a threat of imminent disaster to the health of the citizens of the Commonwealth; and

**WHEREAS**, this threat of imminent disaster and emergency has the potential to cause significant adverse impacts upon the population throughout the Commonwealth; and

**WHEREAS**, this threat of imminent disaster and emergency has already caused schools to close, and will likely prompt additional local measures, including affected county and municipal governments to declare local disaster emergencies because of COVID-19; and

*WHEREAS, this threat of imminent disaster and emergency situation throughout the Commonwealth is of such magnitude and severity as to render essential the Commonwealth's supplementation of emergency resources and mutual aid to the county and municipal governments of this Commonwealth and to require the activation of all applicable state, county, and municipal emergency response plans.*

*NOW THEREFORE, pursuant to the provisions of Subsection 7301(c) of the Emergency Management Services Code, 35 Pa. C.S. § 7101, et seq., I do hereby proclaim the existence of a disaster emergency throughout the Commonwealth.*

*FURTHER, I hereby authorize the Pennsylvania Emergency Management Agency Director or his designee, to assume command and control of all statewide emergency operations and authorize and direct that all Commonwealth departments and agencies utilize all available resources and personnel as is deemed necessary to cope with this emergency situation.*

*FURTHER, I hereby transfer up to $5,000,000 in unused appropriated funds to the Pennsylvania Emergency Management Agency for Emergency Management Assistance Compact expenses related to this emergency, to be decreased as conditions require, pursuant to the provisions of section 7604(a) of the Emergency Management Services Code, 35 Pa. C.S. § 7604(a). In addition, I hereby transfer up to $20,000,000 in unused appropriated funds, to be decreased as conditions require, to the Pennsylvania Emergency Management Agency pursuant to section 1508 of the Act of April 9, 1929 (P.L.343, No. 176) (the Fiscal Code), 72 P.S. § 1508. The aforementioned funds shall be used for expenses authorized and incurred related to this emergency. These funds shall be credited to a special account established by the Office of the Budget. I hereby direct that any funds transferred herein that remain unused after all costs related to this emergency have been satisfied shall be returned to the General Fund.*

*FURTHER, All Commonwealth agencies purchasing supplies or services in response to this emergency are authorized to utilize emergency procurement procedures set forth in Section 516 of the Commonwealth Procurement Code, 62 Pa. C.S. § 516. This Proclamation shall serve as the written determination of the basis for the emergency under Section 516.*

*FURTHER, I hereby suspend the provisions of any regulatory statute prescribing the procedures for conduct of Commonwealth business, or the orders, rules or regulations of any Commonwealth agency, if strict compliance with the provisions of any statute, order, rule or regulation would in any way prevent, hinder, or delay necessary action in coping with this emergency. Commonwealth agencies may implement emergency assignments without regard to procedures required by other laws, except mandatory constitutional requirements, pertaining to performance of public work, entering into contracts, incurring of obligations, employment of temporary workers, rental of equipment, purchase of supplies and materials, and expenditures of public funds.*

*FURTHER, pursuant to the powers vested in me by the Constitution and laws of the Commonwealth pursuant to 51 Pa. C.S. § 508, I hereby authorize the Adjutant General of Pennsylvania to place on state active duty for the duration of the emergency disaster proclamation, such individuals and units of the Pennsylvania National Guard, for missions designated by the Pennsylvania Emergency Management Agency, as are needed to address the consequences of the aforementioned emergency.*

*FURTHER, I authorize the Commissioner of the Pennsylvania State Police to use all available resources and personnel in whatever manner he deems necessary during this emergency to assist the actions of the Pennsylvania Emergency Management Agency in addressing the consequences of the emergency.*

*FURTHER, I hereby authorize the Secretary of the Pennsylvania Department of Health, in her sole discretion, to suspend or waive any provision of law or regulation which the Pennsylvania Department of Health is authorized by law to administer or enforce, for such length of time as may be necessary to respond to this emergency.*

*FURTHER, I hereby authorize the Secretary of the Pennsylvania Department of Education, in his sole discretion, to suspend or waive any provision of law or regulation which the Pennsylvania Department of Education is authorized by law to administer or enforce, for such length of time as may be necessary to respond to this emergency.*

*FURTHER, if investigations made on my behalf determine that the Commonwealth needs greater flexibility in the application of state and federal motor carrier regulations to accommodate truck drivers involved in emergency activities during this emergency, I hereby direct the Commonwealth Department of Transportation to waive or suspend any laws or federal or state regulations related to the drivers of commercial vehicles.*

*FURTHER, I hereby direct that the applicable emergency response and recovery plans of the Commonwealth, counties, municipalities and other entities be activated as necessary and that actions taken to implement those plans be coordinated through the Pennsylvania Emergency Management Agency.*

*STILL FURTHER, I hereby urge the governing bodies and executive officers of all political subdivisions affected by this emergency to act as necessary to meet the current exigencies as legally authorized under this Proclamation, namely, by the employment of temporary workers, by the rental of equipment, and by entering into such contracts and agreements as may be required to meet the emergency, all without regard to those time consuming procedures and formalities normally prescribed by law, mandatory constitutional requirement excepted.*



*GIVEN under my hand and the Seal of the Governor, at the City of Harrisburg, this sixth day of March in the year of our Lord two thousand twenty, and of the Commonwealth the two hundred and forty fourth.*

*TOM WOLF*
*Governor*



# Commonwealth of Pennsylvania

## Governor's Office

### AMENDMENT TO
### PROCLAMATION OF DISASTER EMERGENCY

*June 3, 2020*

*WHEREAS, on March 6, 2020, I declared a disaster emergency due to the coronavirus disease 2019 (COVID-19) pandemic that is devastating the country, including the Commonwealth of Pennsylvania and its citizens;*

*WHEREAS, my Proclamation of Disaster Emergency of March 6, 2020, will automatically expire on June 4, 2020, unless renewed by Amendment;*

*WHEREAS, as of June 3, 2020, 72,894 persons have tested positive or meet the requirements to be considered as presumed probable cases for COVID-19 in the Commonwealth in all 67 counties, and 5,667 persons are reported to have died from the virus; and*

*WHEREAS, the COVID-19 pandemic continues to be of such magnitude or severity that emergency action is necessary to protect the health, safety and welfare of affected citizens in Pennsylvania.*

*NOW THEREFORE, pursuant to the provisions of section 7301(c) of the Emergency Management Services Code, 35 Pa. C.S. §7301(c), I do hereby order and direct as follows:*

1. *The Proclamation of Disaster Emergency of March 6, 2020, is renewed for a period of ninety days, and shall continue to apply to the Commonwealth of Pennsylvania.*

2. *All directives, authorized actions and provisions of the March 6, 2020, Proclamation of Disaster Emergency shall remain in full force and effect until either rescinded by me or terminated by law.*

*This Proclamation Amendment shall take effect immediately.*



*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this third day of June two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.*

**TOM WOLF**
*Governor*



# Commonwealth of Pennsylvania

## Governor's Office

### AMENDMENT TO
### PROCLAMATION OF DISASTER EMERGENCY

#### August 31, 2020

*WHEREAS*, on March 6, 2020, I declared a disaster emergency due to the coronavirus disease 2019 (COVID-19) pandemic that is devastating the country, including the Commonwealth of Pennsylvania and its citizens;

*WHEREAS*, the March 6, 2020, Proclamation of Disaster Emergency would have automatically expired by operation of law on June 4, 2020, unless further extended by my official action;

*WHEREAS*, I renewed the Proclamation of Disaster Emergency dated March 6, 2020, by Amendment to Proclamation of Disaster Emergency (1st Amendment) on June 3, 2020, for an additional ninety days;

*WHEREAS*, the June 3, 2020, Amendment to Proclamation is set to automatically expire by operation of law on September 1, 2020, unless further extended by my official action;

*WHEREAS*, as of August 31, 2020, 134,025 persons have tested positive or meet the requirements to be considered probable cases for COVID-19 in the Commonwealth in all 67 counties, and 7,495 persons are reported to have died from the virus; and

*WHEREAS*, the COVID-19 pandemic continues to be of such magnitude or severity that emergency action is necessary to protect the health, safety, and welfare of affected citizens in Pennsylvania.

*NOW THEREFORE*, pursuant to the provisions of section 7301(c) of the Emergency Management Services Code, 35 Pa. C.S. § 7301(c), I do hereby order and direct as follows:

1. The Proclamation of Disaster Emergency of March 6, 2020, renewed by Amendment to Proclamation of Disaster Emergency dated June 3, 2020, is renewed for a period of ninety days, and shall continue to apply to the Commonwealth of Pennsylvania.

2. All directives, authorized actions, and provisions of the March 6, 2020, Proclamation of Disaster Emergency and June 3, 2020, Amendment to Proclamation shall remain in full force and effect until either rescinded by me or terminated by law.

3. This Proclamation Amendment (2nd Amendment) shall take effect immediately.

*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this thirty-first day of August two thousand twenty, the year of the commonwealth the two hundred and forty-fifth.*

*Tom Wolf*

**TOM WOLF**
*Governor*



COMMONWEALTH OF PENNSYLVANIA
OFFICE OF THE GOVERNOR

*AMENDMENT TO*
*PROCLAMATION OF DISASTER EMERGENCY*

*November 24, 2020*

**WHEREAS,** on March 6, 2020, I declared a disaster emergency due to the coronavirus disease 2019 (COVID-19) pandemic that is devastating the country, including the Commonwealth of Pennsylvania and its citizens; and

**WHEREAS,** the March 6, 2020, Proclamation of Disaster Emergency was set to automatically expire by operation of law on June 4, 2020, unless further extended by my official action; and

**WHEREAS,** I renewed the Proclamation of Disaster Emergency dated March 6, 2020, by Amendment to Proclamation of Disaster Emergency (1st Amendment) on June 3, 2020, for an additional ninety days; and

**WHEREAS,** the June 3, 2020, Amendment to Proclamation was set to automatically expire by operation of law on September 1, 2020, unless further extended by my official action; and

**WHEREAS,** I renewed the Proclamation of Disaster Emergency dated March 6, 2020, by Amendment to Proclamation of Disaster Emergency (2nd Amendment) on August 31, 2020, for an additional ninety days; and

**WHEREAS,** the August 31, 2020, Amendment to Proclamation is set to automatically expire by operation of law on November 29, 2020, unless further extended by my official action; and

**WHEREAS,** as of November 23, 2020, 314,401 persons have tested positive or meet the requirements to be considered probable cases for COVID-19 in the Commonwealth in all 67 counties, and 9,870 persons are reported to have died from the virus; and

**WHEREAS,** the COVID-19 pandemic continues to be of such magnitude or severity that emergency action is necessary to protect the health, safety and welfare of affected citizens in Pennsylvania.

**NOW THEREFORE,** pursuant to the provisions of section 7301(c) of the Emergency Management Services Code, 35 Pa. C.S. § 7301(c), I do hereby order and direct as follows:

1. The Proclamation of Disaster Emergency dated March 6, 2020, renewed by Amendments to Proclamation of Disaster Emergency dated June 3, 2020, and August 31, 2020, is renewed for a period of ninety days, and shall continue to apply to the Commonwealth of Pennsylvania.

2. All directives, authorized actions and provisions of the March 6, 2020, Proclamation of Disaster Emergency and June 3, 2020, and August 31, 2020, Amendments to Proclamation shall remain in full force and effect until either rescinded by me or terminated by law.

3. This Proclamation Amendment (3rd Amendment) shall take effect immediately.

GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this twenty-fourth day of November two thousand twenty, the year of the commonwealth the two hundred and forty-fifth.

TOM WOLF
Governor

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF THE GOVERNOR

# *AMENDMENT TO PROCLAMATION OF DISASTER EMERGENCY*

***February 19, 2021***

***WHEREAS, on March 6, 2020, I declared a disaster emergency due to the coronavirus disease 2019 (COVID-19) pandemic that is devastating the country, including the Commonwealth of Pennsylvania and its citizens; and***

***WHEREAS, the March 6, 2020, Proclamation of Disaster Emergency was set to automatically expire by operation of law on June 4, 2020, unless further extended by my official action; and***

***WHEREAS, I renewed the Proclamation of Disaster Emergency dated March 6, 2020, by Amendment to Proclamation of Disaster Emergency (1st Amendment) on June 3, 2020, for an additional ninety days; and***

***WHEREAS, the June 3, 2020, Amendment to Proclamation was set to automatically expire by operation of law on September 1, 2020, unless further extended by my official action; and***

***WHEREAS, I renewed the Proclamation of Disaster Emergency dated March 6, 2020, by Amendment to Proclamation of Disaster Emergency (2nd Amendment) on August 31, 2020, for an additional ninety days; and***

***WHEREAS, the August 31, 2020, Amendment to Proclamation was set to automatically expire by operation of law on November 29, 2020, unless further extended by my official action; and***

***WHEREAS, I renewed the Proclamation of Disaster Emergency dated August 31, 2020, by Amendment to Proclamation of Disaster Emergency (3rd Amendment) on November 24, 2020, for an additional ninety days; and***

***WHEREAS, the November 24, 2020, Amendment to Proclamation is set to automatically expire by operation of law on February 22, 2021, unless further extended by my official action; and***

***WHEREAS, as of February 18, 2021, 905,995 persons are reported to have tested positive or meet the requirements to be considered probable cases for COVID-19 in the Commonwealth in all 67 counties, and 23,413 persons are reported to have died from the virus; and***

***WHEREAS, the COVID-19 pandemic continues to be of such magnitude or severity that emergency action is necessary to protect the health, safety and welfare of affected citizens in Pennsylvania.***

***NOW THEREFORE, pursuant to the provisions of section 7301(c) of the Emergency Management Services Code, 35 Pa. C.S. § 7301(c), I do hereby order and direct as follows:***

1. ***The Proclamation of Disaster Emergency dated March 6, 2020, renewed by Amendments to Proclamation of Disaster Emergency dated June 3, 2020, August 31, 2020, and November 24, 2020, is renewed for a period of ninety days, and shall continue to apply to the Commonwealth of Pennsylvania.***

2. *All directives, authorized actions and provisions of the March 6, 2020, Proclamation of Disaster Emergency and June 3, 2020, August 31, 2020, and November 24, 2020, Amendments to Proclamation shall remain in full force and effect until either rescinded by me or terminated by law.*

3. *This Proclamation Amendment (4th Amendment) shall take effect immediately.*



*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this nineteenth day of February two thousand twenty-one, the year of the commonwealth the two hundred and forty-fifth.*

*TOM WOLF*
*Governor*

Exhibit 9

Pennsylvania Dept. of Revenue, *Masks and Ventilators*
(Apr. 23, 2020)



# Masks and Ventilators

Answer ID 3748   |   Published 04/23/2020 05:19 PM   |   Updated 04/23/2020 05:19 PM

### Are masks and ventilators subject to PA sales tax?

Protective face masks that are sold at retail are exempt from Pennsylvania sales tax during the emergency disaster declaration issued on March 6, 2020 by Governor Wolf. The emergency disaster declaration was issued in response to the COVID-19 pandemic.

 Masks sold at retail are typically subject to Pennsylvania sales tax. However, during the emergency disaster declaration the Department of Revenue considers these protective masks to be akin to medical equipment.  Pennsylvania sales tax is not imposed on certain medical equipment or supplies, such as disposable surgical masks or ventilators.

Copyright � 2010 Pennsylvania Department of Revenue. All Right Reserved.

Commonwealth of PA Privacy Statement



Exhibit 10

Pennsylvania Dept. of Revenue, Sales and Tax Bulletin
2021-01 (Jan. 20, 2021)



<div align="center">

**SALES AND USE TAX BULLETIN 2021-01**

**Sales and use tax exemption for non-medical masks and face coverings**

**Issued: January 20, 2021**

**Effective Date: October 30, 2020**

</div>

The Department of Revenue ("Department") issues this Sales and Use Tax Bulletin to inform persons responsible for charging, collecting and remitting sales tax of the tax treatment of non-medical masks and face coverings.

Medical supplies, including medical and disposable surgical masks, are exempt from Pennsylvania sales tax.  72 P.S. § 7204(17); Retailer's Information Guide (REV-717).  Prior to COVID-19, non-medical masks and face coverings were subject to sales tax because non-medical masks and face coverings were generally classified as ornamental wear or clothing accessories and the use for which consumers purchased non-medical masks and face coverings was not for an exempt purpose.  72 P.S. § 7204(26); Retailer's Information Guide (REV-717). Retailers were not obligated to determine whether a non-medical mask or face covering would be used for medical purposes because "[t]he determination that purchases qualify for exemptions as…medical supplies and the like, is based essentially upon the use for which the purchase are intended."  61 Pa. Code § 52.1(a).

On March 6, 2020, pursuant to the provisions of Subsection 7301(c) of the Emergency Management Services Code, 35 Pa. C.S. § 7101, *et seq.*, Governor Tom Wolf issued a Proclamation of Disaster Emergency in response to the COVID-19 pandemic, authorizing "all Commonwealth departments and agencies [to] utilize all available resources…as deemed necessary to cope with this emergency situation."  In response to consumer demand for medical masks outpacing supply and leading consumers to use non-medical masks and face coverings[1] for medical purposes, namely to prevent and control the spread of COVID-19, the department responded with a statement that any non-medical cloth or disposable mask purchased for use as a means of protection against the virus was not subject to sales or use tax.  Accordingly, the department will not assess retailers for failing to collect sales tax on purchases of non-medical masks and face coverings.  Additionally, consumers who can certify to the department that a cloth or disposable non-medical mask or face covering was purchased and used as a means of protection against the virus can petition the department for a refund of any sales or use tax paid.

As of October 30, 2020, in response to the ubiquitous use of non-medical masks and face coverings, the department recognizes that both cloth and disposable non-medical masks and face coverings are exempt from sales and use tax as everyday wear or clothing.

---

[1] The Pennsylvania Department of Health, in its November 17, 2020, Updated Order Requiring Universal Face Coverings, defines "face covering" as "covering of the nose and mouth with material that is secured to the head with ties, straps, or loops over the ears or is wrapped around the lower face."  It can be "made of a variety of synthetic or natural fabrics, including cotton, silk, or linen" and "may be factory-made, sewn by hand, or improvised from household items, including, but not limited to, scarfs, [or] bandanas."

Exhibit 11

Ulta Salon, Cosmetics & Fragrance, Inc. Receipt



Cranberry Township
20111 Route 19, Suite 110
Cranberry Township, PA 16066
724-776-3975

TRANS 3026    DATE 10/17/20 TIME 3:03 PM
STORE 1011    REG 3    CASHIER Mackenzie

| Item | Qty | Price | Amount |
|------|-----|-------|--------|
| ULTA FACE MASK BLACK | | | |
| 717897091454 | | 2.50 | 2.50 |
| ULTA FACE MASK BLACK | | | |
| 717897091454 | | 2.50 | 2.50 |
| | | | |
| SUBTOTAL | | | 5.00 |
| | TAX | 6.0000% | 0.30 |
| TAX | TOTAL | | 0.30 |
| TOTAL | | | 5.30 |

| CASH | 5.30 |
|------|------|

| CHANGE | 0.00 |
|--------|------|

CASH                                          5.30
CHANGE                                         0.00

**************************************************
                  ULTAMATE REWARDS
           MEMBER NUMBER: 2910523570325

BASE POINTS EARNED                               5
BIRTHDAY POINTS                                  5
CURRENT POINTS BALANCE                          77
REDEEMABLE POINTS                                0

POINTS EXPIRING  12/31/2020                      0
**************************************************
   *If you made a donation to the Ulta Beauty
  Charitable Foundation, a 501 (c) (3) non-profit
  organization, please keep this receipt for your
  tax records. Thank you for helping us make a
            difference in our communities.

            We'd love your feedback!
           Visit HTTP://SURVEY.ULTA.COM
 or text SURVEY to 95637 to receive the link and
   agree to receive up to 2 autodialed marketing
  messages from Ulta Beauty to the number used.
Consent is not a condition of purchase. Reply HELP
  for help to 95637.  Standard message and data

rates may apply.   View Mobile Terms and Conditions
and Privacy Policy at http://ulta.com/smshelp



911011033026202917

SOLD ITEM COUNT = 2

PLEASE RETAIN RECEIPT FOR RETURNS
CHECK US OUT ON-LINE AT
WWW.ULTA.COM
GIFT CARDS- PERFECT FOR ALL OCCASIONS
REDEEMABLE AT ULTA STORES AND ON-LINE

GUEST COPY

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

MARTHA BAILEY, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

ULTA SALON, COSMETICS & FRAGRANCE, INC.,

      Defendant.

CIVIL DIVISION

No. GD-21-003192

CLASS ACTION

**ACCEPTANCE OF SERVICE**

Filed on behalf of Defendant:
Ulta Salon, Cosmetics & Fragrance, Inc.

Counsel of record for Defendant:

Kenneth M. Argentieri
DUANE MORRIS LLP
600 Grant St.
Suite 5010
Pittsburgh, PA 15219-2802
T. (412) 497-1005
F. (412) 202-0669
kmargentieri@duanemorris.com

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

MARTHA BAILEY, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

ULTA SALON, COSMETICS & FRAGRANCE, INC.,

      Defendant.

CIVIL DIVISION

No. GD-20-003192

CLASS ACTION

### ACCEPTANCE OF SERVICE

I, Kenneth M. Argentieri, accept service of the Class Action Complaint in the above-captioned matter on behalf of Ulta Salon, Cosmetics & Fragrance, Inc. and certify that I am authorized to do so.

      Respectfully Submitted,


Dated: April 5, 2021

*s/ Kenneth M. Argentieri*

Kenneth M. Argentieri
DUANE MORRIS LLP
600 Grant St.
Suite 5010
Pittsburgh, PA 15219-2802
T. (412) 497-1005
F. (412) 202-0669
kmargentieri@duanemorris.com

*Counsel for Defendant Ulta Salon, Cosmetics & Fragrance, Inc.*